Filed 12/22/14  In re Monica G. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MONICA G., a Person Coming Under the Juvenile Court Law. | B255592 |
| | (Los Angeles County Super. Ct. No. CK91004) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| CHRISTOPHER G., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Annabelle G. Cortez, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Melinda A. Green, Deputy County Counsel for Plaintiff and Respondent.

Christopher G. (father) appeals from a judgment of the juvenile court, challenging the court's jurisdictional order regarding his minor daughter Monica G. He contends that the juvenile court erred in admitting the prior testimony of an absent witness, and that the jurisdictional findings are unsupported by substantial evidence. We find no merit to father's contentions and affirm the judgment.

## BACKGROUND

Monica was detained after she suffered serious head injuries that appeared to be inconsistent with mother's explanation that she had accidentally fallen in the bathtub. In December 2011, the Department of Children and Family Services (DCFS or the Department) filed a petition under Welfare and Institutions Code section 300 to bring Monica within the jurisdiction of the juvenile court (section 300 petition).[1] The section 300 petition alleged that Monica had been medically examined on November 14, 2011, and found to be suffering from severe physical abuse which included bruising to her face and ears, left intraparenchymal hemorrhage, a basal ganglia hemorrhage, edema, and inflammation in the temporal lobe; and that such injuries were consistent with non-accidental trauma.

In the detention report, the DCFS social worker (CSW) reported that after Monica was hospitalized she interviewed mother who told CSW that while giving Monica a bath at approximately 9:30 p.m., she turned to get a towel, when Monica stood, slipped, and fell, hitting the left side of her face. Father told CSW that he was not home at the time of the incident and that mother telephoned him about Monica's fall in the bathtub. Mother explained she did not call 911 at first because Monica cried and did not lose consciousness. However, two hours after putting Monica to bed, mother checked on her, became concerned, and called 911. The paramedics who responded advised monitoring the child closely, but did not take her to the hospital. Just before noon the following day, mother called 911 again when Monica appeared to be in an altered state. Monica was

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

airlifted to the Los Angeles County/USC Medical Center in critical condition. The following month, she was released to a rehabilitation center.

The CSW also interviewed emergency room physician Dr. Ho, who told CSW that he suspected child abuse because the injuries were inconsistent with mother's claim that Monica slipped and fell in the bathtub. Treating physician, Dr. Yu, said he could not conclusively diagnose the injuries as abuse or neglect. Another physician, Dr. Yager, found Monica's injuries to be inconsistent with mother's explanation.

The CSW also spoke to Dr. Schmidt Villaneuva who had examined Monica several months earlier and observed symptoms of cerebral palsy and spasticity of the lower extremities. Though Dr. Schmidt Villaneuva gave mother a referral to a specialist at Loma Linda Hospital, she did not believe mother had taken Monica to see that specialist. Mother's first child, Monica's half-brother Anthony, had been removed from mother's custody in 2008 for medical neglect and permanently placed in Orange County. It was determined that father had a prior misdemeanor conviction for spousal battery.

In March 2012, an amended section 300 petition was filed, alleging that under subdivision (b)(3) that when Monica was diagnosed with cerebral palsy and other disorders in July 2011, mother and father failed to follow through with the recommended medical treatment. The parents had a history of failing to follow through with medical treatment for Anthony, which had resulted in mother's failure to reunify with him. The juvenile court sustained that count on June 14, 2012, and dismissed the remaining counts. Monica was placed in the custody and care of a maternal aunt, mother and father had weekly monitored visits, and the court ordered family reunification services.

In November 2012, father filed a request to change the juvenile court's prior visitation order to permit unmonitored and overnight visits, but father withdrew his modification request prior to the scheduled hearing. In its interim review report prepared for the hearing, the Department recommend against granting father's request. The CSW reported that father was in partial compliance with the case plan, having taken classes in parenting, first aid, CPR, and Monica's medical care, but had not enrolled in individual counseling or consistently attended Monica's medical and physical therapy appointments.

3

In addition, a police investigation had begun regarding Monica's November 2011 injuries, after a witness came forward to report that she knew Monica had not fallen in the tub as she had observed father kick Monica several times in the head. Dr. Janet S. Arnold-Clark reviewed Monica's medical records and concluded that repeated kicks to the head provided a better medical explanation for Monica's injuries than a single blow to the head during a fall in the tub, whether she landed on the side of the tub or on a faucet.

Criminal proceedings were commenced against both father and mother, who were taken into custody. The Department's interim review report filed in December 2012 included statements from the percipient witness. The witness told police that she had rented a room in mother's apartment for a short time and was living there in November 2011, when she observed the incident that resulted in Monica's injuries. She described a party at mother's home, during which father punched Monica in the chest with his fist after Monica accidentally dropped his cell phone into water. Twenty minutes later, the witness heard a thud, looked out her bedroom door, and saw father kick Monica four times in the head as she lay on the floor unconscious. When she attempted to call the fire department, father took the phone from the witness's hands and threw it across the room. Mother was present during the entire incident, but did not attempt to stop father, and appeared fearful about calling the fire department. The witness was later able to hide in the bathroom and call the fire department.

In February 2013, the Department filed a subsequent petition for juvenile court jurisdiction based upon newly discovered evidence, pursuant to section 342 (section 342 petition). The section 342 petition alleged the following facts under section 300, subdivisions (a)(1), (b)(1), and (e)(1)[2]: on November 13, 2011, father physically abused

---

[2]    Under section 300, subdivision (a), a child comes within the jurisdiction of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Section 300, subdivision (b), provides for jurisdiction when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's

4

Monica by repeatedly kicking her head, striking her chest with his fist, and preventing an "unrelated female 'Name Unknown'" from obtaining emergency medical treatment; among other injuries, the abuse resulted in bleeding and inflammation in the child's brain, seizures, and severe right-sided weakness; one year later, the child was diagnosed with "a hemorrhagic focus of a Diffuse Axonal Injury and deep brain trauma"; such physical abuse caused the child unreasonable pain and suffering; mother knew of the abuse, failed to protect the child, and gave false and misleading information to law enforcement and emergency medical personnel regarding the manner in which the child sustained the injuries; and father was arrested on December 4, 2012, on criminal charges relating to the abuse.

The following month, the Department filed a report summarizing the section 300 petition sustained in this case in 2012, as well as the dependency petition sustained on behalf of Monica and Anthony in 2008, which included the following facts: Anthony (whose alleged father was unknown) suffered from serious medical conditions, including deep vein thrombosis, kidney atrophy, and spinal cord malformation; and that mother had demonstrated a blatant disregard for his health and safety by, among other things, missing medical appointments and failing to fill prescriptions or to comply with medical providers' recommendations; both children witnessed father assault mother by punching her in the knee, grabbing her neck, and scratching her arm; father had a history of alcohol and other substance abuse, with no documented completion of a treatment program; father had a criminal record, including spousal battery and arrest for child cruelty; and father knew that mother was neglecting Anthony but failed to protect him.

On June 28, 2013, mother gave birth to baby Christopher, who was detained and placed with his maternal grandmother. The adjudication hearings for Monica and Christopher were continued several times due to the criminal charges against mother and

parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." Subdivision (e) provides for jurisdiction when "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."

5

father.  In the meantime, mother submitted the consultation letter of neurologist Dr. Charles Niesen, who had reviewed Monica's medical records.  Dr. Niesen found Monica's injuries inconsistent with shaken baby syndrome or intentional injury, and opined that the injuries could have occurred as mother claimed.

The 12-month review hearing based upon the section 300 petition was held January 6, 2014, at which time the juvenile court terminated parents' reunification services pursuant to section 366.21, and scheduled a permanent plan hearing for May 5, 2014.  The court found that 24 months had elapsed since Monica was first removed from her parents' custody, that parents were not in full compliance with the case plan in that they failed to regularly attend Monica's medical and educational appointments or complete individual counseling, and that due to such lack of compliance, it would be detrimental to return Monica to her parents.  The court found that the parents could not currently take custody of Monica as they were incarcerated, and found no substantial probability that Monica could be returned safely to them in the future.

On January 7, 2014, the hearing on the section 342 petition regarding Monica and the section 300 petition regarding Christopher commenced.  The juvenile court heard testimony over several days.  The Department was unable to produce the witness, Starr Tapia (Tapia), who had reported seeing father kick Monica in the head.  Tapia had been present in the juvenile court on November 6, 2013, pursuant to the Department's subpoena.  She was in custody at the time due to a warrant issued by the criminal court and was then due to testify in the parents' preliminary hearing the following day.  The juvenile court ordered Tapia to return on January 3, 2014, and informed her that if she failed to appear a warrant would be issued for her arrest.  Tapia did not appear in juvenile court, and the court issued a bench warrant.

Earlier the Department's counsel reported that Tapia had left the criminal court after her preliminary hearing testimony.  Detective Uribe, the investigating officer in the parents' criminal case, told the Department's counsel that Tapia had left a message from an unidentified number saying she would come to see him that day (Jan. 6, 2014), but she did not show up.  Detective Uribe said he would bring Tapia to court if he learned her

whereabouts. When Detective Uribe had not located Tapia by January 7, counsel asked that Tapia be declared unavailable and that her preliminary hearing testimony be admitted into evidence pursuant to Evidence Code sections 1290 and 1291. The juvenile court ruled that Tapia was unavailable and overruled father's hearsay objections to Tapia's statements in all DCFS reports in evidence, but noted that under section 355, subdivision (c), the hearsay statements would not be sufficient by themselves to support a jurisdictional finding.

The Department called Dr. Arnold-Clark, who was board certified in child abuse pediatrics with 10 years of experience working with abused and neglected children. Dr. Arnold-Clark was the medical director of the LAC+USC violence intervention program and its child abuse pediatrics clinic, where she supervised seven nurse practitioners who performed child abuse evaluations.

Dr. Arnold-Clark testified that she had examined Monica in December 2012 and reviewed the medical records from Monica's hospitalization in November and December 2011. She also reviewed the radiology studies and photographs from that time, interviewed Monica's treating neurologist, consulted a pediatric neuroradiologist, and reviewed both the initial CT scan as well as the second scan taken one year later. Photographs showed significant bruising on Monica's ear and scans showed a hemorrhage in the basal ganglia deep in the brain, as well as areas of diffused axonal injury of the type seen during acceleration and deceleration of the brain as it is knocked around inside the skull. In Dr. Arnold-Clark's opinion, Monica's injuries were consistent with the newly obtained history of being repeatedly kicked in the head. She was also of the opinion, that absent evidence of being kicked, Monica's injuries were most likely caused by severe head trauma with direct blows to the head.

Dr. Arnold-Clark ruled out a preexisting birth defect or brain malformation by the severe presentation at the time of the incident (bleeding in the brain, inability to speak, right-side weakness, seizures). She explained that signs of a birth defect would have appeared on the 2012 CT scan but did not. Nor could cerebral palsy have been a factor. Dr. Arnold-Clark explained that Monica had been born prematurely and had shown

minor symptoms of cerebral palsy, a static condition which generally did not worsen over time, and would not cause the extent of bleeding in the brain, the sudden seizures, the right-side weakness, or the inability to speak that Monica suffered at that time of the injury. The bleeding deep within the brain was highly correlated with non-accidental or abusive trauma, and consistent with a forcible blow to the head with a hard object, such as a forcible kick.

In addition, Dr. Arnold-Clark found the severe bruising on Monica's left ear and mastoid behind the ear to be significant. She explained that children tend to fall forward or backward, making it difficult to fall on the ear, and the severe bruising on both the outer ear and the mastoid was inconsistent with a single injury. The absence of a skull fracture suggested she did not fall onto a hard surface. In Dr. Arnold-Clark's opinion, the injuries could not have been the result of hitting the head on the side of a bathtub or on a bathtub faucet, or both. Dr. Arnold-Clark was also of the opinion that the trauma resulted in a long-term injury and that Monica continued to have deficits consistent with her injury. If left untreated, Monica's long-term injuries could have been permanent or could have resulted in death.

Mother called Dr. Niesen, the neurologist whose consultation letter had been previously submitted to the court. Dr. Niesen was board certified in child neurology and had testified as an expert witness for parents in juvenile court about 20 times before. He was not board certified in child abuse pediatrics. Dr. Niesen reviewed the medical records, including laboratory reports and CT and MRI scans from Monica's initial hospitalization in November 2011. Dr. Niesen did not speak to Monica's treating neurologist, but noted that the neuroradiologist who reviewed the 2011 scans found a lesion indicating a blood vessel abnormality in the brain that had probably burst, causing bleeding deep within the brain. Dr. Niesen agreed with that observation and was of the opinion that the lesion was indicative of a congenital abnormality which irritated the

brain when it bled and caused the seizures. He saw no evidence on the MRI of an acquired injury typically seen in abusive head trauma.[3]

Dr. Niesen did not recall whether he reviewed the 2012 CT scan, but did not believe the later scan would provide any significant information about the original cause of the bleeding. He believed that Monica's bruises and unconsciousness could have been the result of a fall in the bathtub, and that hitting her head on the tub or a faucet could have precipitated the bleeding in her brain. Dr. Niesen acknowledged that even if the bleeding came from the area of a congenital abnormality, it could have been precipitated by repeated kicks to the head. He also thought that kicking would have produced additional abnormalities, such as brain swelling or a subdural hematoma, which Monica did not have. He explained, however, that multiple kicks to the head would not always produce brain swelling or a subdural hematoma, and he could not rule out the possibility that Monica was kicked in the head.

The juvenile court found Tapia was unavailable as a witness, that she had made herself unavailable despite a subpoena, court order, the issuance of a warrant, and the Department's reasonable diligence in attempting to procure her attendance. The court then admitted Tapia's preliminary hearing testimony, but noted that to the extent the Tapia evidence was hearsay, it was not the sole support for the jurisdictional finding or any ultimate fact on which it was based. The court gave great weight to Dr. Arnold-Clark's testimony and opinion, due to her experience, certified specialty, her reliance on thorough information, her examination of Monica, and her consultation with treating physicians. The court did not credit Dr. Niesen's opinion that a fall in the bathtub could have caused the injuries, as he had reviewed limited information, and did not consult treating physicians or Dr. Arnold-Clark. The court noted that Dr. Arnold-Clark found that the injuries indicated trauma and were inconsistent with a fall in the tub.

---

[3] Dr. Niesen explained that he used the term "shaking baby syndrome" in his earlier letter because attorneys understand that term, although there was no evidence of shaking in this case.

9

The court adopted the facts outlined by DCFS counsel in summation as the court's factual findings, thus apparently finding that Monica's injuries were intentionally inflicted by father. However, relying on "En re E H" [*sic*],[4] the court concluded that the evidence was sufficient to sustain the petition under section 300, subdivisions (a), (b) and (e), without identifying the perpetrator of the abuse. The court found by a preponderance of the evidence that Monica suffered non-accidental trauma while in the parents' custody and in the presence of mother, that mother provided false information, and that parents had not met their burden to show that they did not cause the injuries. The court thus sustained the section 342 petition under section 300, subdivisions (a)(1), (b)(1), and (e)(1).[5]

On February 13, 2014, the court declared the children dependents of the juvenile court and entered dispositional orders removing both children from parents' custody. Father filed a timely notice of appeal from the judgment.

## DISCUSSION

### I. Admission of hearsay

Father contends that Tapia's hearsay statements in the Department's reports and her preliminary hearing testimony should have been excluded. He contends that admission of the hearsay resulted in a violation of his constitutional right of confrontation, and that other than the hearsay statements, there was insufficient admissible evidence to sustain the finding that he kicked Monica in the head.

A claim that the juvenile court erroneously admitted evidence is not reversible without a showing of prejudice. (*In re James F.* (2008) 42 Cal.4th 901, 914-917.) This rule pertains as well to claims that a constitutional right has been violated by the admission of the evidence. (*Id*. at p. 917.) It is the appellant's burden to show how the outcome would have been different absent the error. (See *In re Jesusa V.* (2004) 32

---

[4]     The court apparently meant *In re E. H.* (2003) 108 Cal.App.4th 659, discussed within.

[5]     The court also sustained the allegations of Christopher's section 300 petition. The judgment with regard to Christopher was separately appealed.

Cal.4th 588, 625; *In re Rebecca R*. (2006) 143 Cal.App.4th 1426; Cal. Const., art. VI, § 13.)

Father has failed to make a sufficient argument of prejudice. Although he contends that the hearsay statements were the only evidence that he kicked Monica, he does not describe how the outcome would be different without that information. As the juvenile court stated in making its findings, proof of the identity of the perpetrator of Monica's injuries was not a prerequisite to sustaining the section 342 petition under section 300, subdivisions (a), (b), or (e), as the court did, when non-accidental injuries are suffered while the child is in a parent's custody. (*In re A.S.* (2011) 202 Cal.App.4th 237, 245-246; see *In re E. H., supra*, 108 Cal.App.4th at pp. 666-669 [subdivision (e)]; *In re Christina T*. (1986) 184 Cal.App.3d 630, 640 [subdivision (a)].) The identity of the perpetrator becomes significant after jurisdiction is established and the juvenile court must determine whether the child should be removed from the home. (*In re Christina T., supra*, at p. 640.)

Regardless, father has also failed to show that the juvenile court erred in admitting Tapia's hearsay statements. The prior testimony of an unavailable witness is admissible against parties to the prior proceeding who had the opportunity to cross-examine the witness with a similar interest and motive as in the current proceedings. (Evid. Code, § 1291, subd. (a)(2).)[6] A witness is unavailable where the proponent of the evidence "exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) Father contends that the Department failed to demonstrate reasonable diligence. While the question whether due diligence has been exercised turns on the facts and circumstances of each particular case, it can be sufficient to show that the witness was served with a subpoena, as Tapia was here. (See *People v. Perez* (1989) 207 Cal.App.3d 431, 434-435.)

---

[6]     The juvenile court noted that DCFS counsel represented to the court that both parents were represented by counsel at their preliminary hearing, which dealt with the same issues, and that they had the opportunity to fully cross-examine Tapia in that proceeding.

Father contends that the juvenile court should have brought Tapia into court, ordered her to testify, and held her in contempt if she refused. As respondent observes, father does not explain how the trial court would accomplish this with an absent witness. Moreover, the issue is not what the court should have done, but the diligence of the Department. (See Evid. Code, § 240, subd. (a)(5).) Here, the Department served Tapia with a subpoena, had her ordered to return to court with a warning that a bench warrant would issue if she did not; and when Tapia did not return, the Department obtained a bench warrant and asked Detective Uribe to locate and bring Tapia to court if he could. These attempts are not unreasonable simply because father can think of additional efforts that might have been undertaken. (See *People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

Moreover, even if we agreed that the Department's efforts were unreasonable, rendering inapplicable the hearsay exception of Evidence Code section 1291, subdivision (a)(2), father has not shown that the court erred in admitting the hearsay statements set forth in the Department's reports. The juvenile court's admission of the hearsay statements is reviewed for an abuse of discretion. (*In re Cindy L.* (1997) 17 Cal.4th 15, 35 (*Cindy L.*).) An exercise of discretion will not be disturbed on appeal unless it is shown to be arbitrary, capricious or otherwise exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Hearsay evidence contained in social study reports is admissible in a jurisdictional hearing, but where a timely objection has been made to such evidence and no hearsay exception applies, it will "not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based." (§ 355, subd. (b), (c)(1).) Father's objection to the hearsay statements was overruled by the court because the court had found Tapia unavailable, but the court also made clear that it did not base its jurisdictional finding or any ultimate fact necessary to its finding solely upon Tapia's statements. With sufficient corroboration, hearsay declarations will support a jurisdictional finding. (*In re B.D.* (2007) 156 Cal.App.4th 975, 983-984 (*B.D.*).) "In this context, corroborating evidence is that which supports a logical and reasonable inference

that the act described in the hearsay statement occurred. [Citation.]" (*Id.* at p. 984, citing *Cindy L., supra*, 17 Cal.4th at p. 35.)

The standard for sufficient corroboration with respect to dependency jurisdictional findings "is analogous to the rule in criminal law requiring independent corroborative proof of accomplice testimony. [Citation.]" (*In re Christian P.* (2012) 208 Cal.App.4th 437, 448 (*Christian P.*), citing *B.D., supra*, 156 Cal.App.4th at pp. 984-985.) Thus, corroborating evidence may be slight so long as it connects the parent with the alleged abuse, and it need not go so far as to establish by itself, without the aid of the hearsay testimony, that the parent committed the alleged conduct. (*Christian P., supra*, at p. 448; *B.D., supra*, at p. 984.) The corroborating evidence was sufficient here. Dr. Arnold-Clark testified that Monica's injuries could not have been the result of an accidental fall in the bathtub, that they were consistent with being repeatedly kicked in the head, and if not caused by kicks, they were caused by some other type of direct blows to the head. In addition, Tapia's claim that father prevented her from calling for emergency help was corroborated by the two-hour delay in time before paramedics were called.

Father contends that Dr. Arnold-Clark's testimony is insufficient because she did not in fact know that kicks to the head rather than some other type of blows were the cause of the injuries, or that father inflicted the injuries, as there was no evidence of father's conduct independent of the hearsay statements. We disagree. The requirement for admissibility is corroboration, not independent proof. (*Cindy L., supra*, 17 Cal.4th at p. 35.) Thus, the test is not whether there is independent evidence that the parent committed the alleged conduct; further, corroborative evidence may be slight and need not establish the conduct without the aid of the hearsay testimony. (*Christian P., supra*, 208 Cal.App.4th at p. 448; *B.D., supra*, 156 Cal.App.4th at p. 984.) We conclude that the medical evidence gives rise to the logical and reasonable inference that the conduct described in Tapia's hearsay statement occurred; thus there was no abuse of discretion in its admission. (See *Cindy L., supra*, at p. 35.)

13

## II. Substantial evidence

Father contends that substantial evidence did not support jurisdiction for the additional reason that the expert testimony was conflicting and thus did not conclusively establish the cause of Monica's injuries. Father summarizes the testimony of Dr. Niesen which contradicted Dr. Arnold-Clark's opinions. He also complains that the juvenile court gave little or no weight to a letter about which Dr. Arnold-Clark was briefly questioned during her testimony.[7]

"The test, however, is not whether there is substantial conflict, 'but rather whether there is *substantial evidence in favor of the respondent*. If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment will be affirmed.' [Citation.]" (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 644, fn. 12.) To determine whether substantial evidence supports jurisdictional findings, we consider both contradicted and uncontradicted evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Moreover, we do so in the light most favorable to the court's findings. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Issues of fact and credibility are questions for the juvenile court and it is not our function to redetermine them. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199-200.) "We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) Indeed, we look only to the evidence supporting the prevailing party, and may disregard the contrary showing altogether. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.)

The juvenile court expressly credited the opinions of Dr. Arnold-Clark and rejected those of Dr. Niesen. As father does not claim or demonstrate that Dr. Arnold-Clark's observations and conclusions were impossible or inherently improbable, but

---

[7] Dr. Arnold-Clark testified that Dr. Heger, the letter's author, held a similar opinion to that of Dr. Arnold-Clark, that Monica's injuries were consistent with being repeatedly kicked in the head and inconsistent with falling in the bathtub.

14

merely argues that they were contradicted, we must accept the court's determination. (See *People v. Ennis* (2010) 190 Cal.App.4th 721, 728-729.) We conclude that Dr. Arnold-Clark's opinion that Monica's injuries were consistent with multiple kicks to the head, and Tapia's statements that father repeatedly kicked Monica in the head the night she sustained her injuries, provide substantial evidence to support the juvenile court's findings.

## DISPOSITION

The judgment of the juvenile court is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT