67 Cal.Rptr.3d 810 (2007)
156 Cal.App.4th 975
In re B.D. et al., Persons Coming Under the Juvenile Court Law.
Sacramento County Department of Health and Human Services, Plaintiff and Respondent,
v.
G.P. et at., Defendants and Respondents;
B.D. et al., Appellants.
No. C053745.
Court of Appeal of California, Third District.
November 7, 2007.
*811 Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Appellants.
Maureen L. Keaney, for Respondent G.P.
No appearance for Respondent, A.H.
Certified for Partial Publication.[*]
CANTIL-SAKAUYE, J.
The minor children, B.D. and X.H., appeal from an order of the juvenile court dismissing a petition (Welf. & InstCode, § 300)[1] filed on behalf of X.H. and a subsequent and supplemental petition (§§ 342, 387) filed on behalf of B.D. The minors contend the trial court erred in sustaining section 355 objections to four witness statements and that even if the objections were properly sustained as to all of the witness statements, mother's admission provided independent corroboration sufficient to sustain the petitions. We shall reverse and remand.

RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY
B.D. was born on May 17, 2004, to mother, G., herself a dependent child at the time. On May 19, 2004, the Department of Health and Human Services (DHHS) filed *812 a section 300 petition alleging mother had emotional problems which had resulted in her hospitalization. The detention report indicated mother had had several "psychiatric hospitalizations in 2002 for suicidal ideation, depression, self-mutilation, hearing voices, and hallucinations.[2] Furthermore, the minor mother fails to follow through with taking psychotropic medications. Additionally, the minor mother expresses anger by breaking windows, throwing food and plates against the wall, and assaulting the maternal grandparents."
Part of mother's history included an arrest for battery against a school employee in 2002. Mother's father informed the social worker that mother was abusive towards himself and his wife, she destroyed things and "curses people out." Neither parent wanted mother to return to their home. Mother had a history of hitting other people, including her father and a teacher.
In August 2004, mother admitted the allegations of the petition, and B.D. was declared a dependent child. In September 2004, B.D. and mother were placed together in a foster home. Mother's parenting abilities improved. Mother's behavior also improved. She was cooperating with her case plan and keeping appointments. She had not expressed any suicidal ideation or engaged in any self-mutilation. In counseling, mother's mood ranged from depression to anger. She was also taking 50 milligrams of Zoloft for mood disorder and postpartum depression.
A psychological evaluation was conducted in December 2004. During her examination, mother "was mildly depressed, reserved and somewhat angry." The psychologist opined mother's overall treatment and service amenability was marginal. He believed she would only participate in services as a means of securing custody of B.D., rather than actually trying to benefit from services. The psychologist recommended mother continue individual counseling with a focus on improving her self-esteem, addressing her anger control difficulties, lack of trust in others, chronic depression, parenting skills and ability to protect her child.
A May 2005, progress report noted mother was participating in a number of parenting classes. She had also become more cooperative in participating in counseling sessions. She was making progress in counseling and appeared to interact well with B.D. Mother reported she was two months pregnant. Mother had noticed a significant difference in her behavior since she began taking Zoloft. She had not had any behavioral outbursts since being in her foster mother's care. She was making reasonable progress in her case plan. As of July 2005, mother continued to do well in her case plan, attending parenting classes, and counseling sessions.
X.H. was born in October 2005. X.H. was not placed in protective custody. X.H., B.D. and mother all lived together in a foster home. As mother was approaching her 18th birthday, she and the social worker discussed her plans. The social worker recommended mother seek transitional housing, but mother stated her intention to move back in with her parents. Mother continued to participate in parenting classes and counseling. She also continued to interact well with B.D. Mother continued taking Zoloft, but indicated she did not know why she was taking the medication.
*813 In April 2006, mother continued to make progress. She appeared to "be doing better with her anger and appears happier." Interactions between mother and the children appeared appropriate. She had been accepted into transitional housing, but planned to move in with her parents. The parents lived in a small one-bedroom trailer.
Mother moved back in with her parents in May 2006. The social worker reported mother had matured a great deal over the course of the case and had learned to better deal with her anger. Mother was attending a technology school but was unemployed. She continued to receive counseling services and was making progress. Mother indicated she had stopped taking Zoloft, because she had not been provided with additional medication. Mother was having difficulty procuring employment and difficulty with her finances. She appeared stressed.
In June 2006, DHHS filed section 342 and 387 petitions on behalf of B.D. and a section 300 petition on behalf of X.H. The petitions alleged that on June 20, 2006, mother had struck B.D. on the face and thrown him into a bench, causing significant pain and bruising. With respect to X.H., it was further alleged that mother suffered psychiatric/emotional problems which rendered her incapable of providing adequate care and supervision.
The detention report contained a statement from an unidentified witness. In this statement, the witness stated mother and B.D. were running for the light rail train. Mother hit B.D. in the back of his head and he lost his balance and fell. B.D. was taken to the hospital. He was found to have a scar on his right forehead, a bruise on his left cheek and dried blood in his right nostril.
Social worker Bennett-Jordan spoke with mother who reported she and B.D. were running for the light rail and B.D. fell. Mother did not acknowledge hitting B.D. in the back of the head. She explained B.D.'s nosebleed occurred because of the heat.
Social worker Zielenski interviewed mother on June 21, 2006. When asked if she knew why the children had been placed in protective custody, she responded, "I tapped B.D. on the back of the head. There were women present who said I cocked my hand back and I hit him. They told me to take it easy on my child and to stop slapping him around. What had happened was we were walking fast and he tripped. I did not throw him on the bench." With respect to B.D.'s bloody nose, mother indicated she was cleaning B.D.'s nose and "he had a scab, and that's why it started to bleed."
Mother also reported she was not taking medication and had not been taking medication since January or February 2006.
The August 2006 jurisdiction/disposition report contained additional information. X.H.'s father was interviewed and indicated he was not at the light rail station, so did not know if the allegations were true. However, he noted that on one occasion he, B.D. and mother had gone to the movies and a group of people called the police because they witnessed mother hitting B.D. on the head. While he had not seen that incident, and had never seen mother "beating B[.D.]," he did once see mother hit "B[.D.] on his arms and legs with an open fist." He also reported, although he did not know about her psychiatric problems, he knew she was quick to become angry.
The police report of the light rail incident indicated when officers arrived at the scene, they observed a small bump on B.D.'s forehead, as well as bleeding from *814 his left nostril. Officers spoke with four witnesses who described the incident.
Pamela E. reported she saw mother and B.D. walking in front of her. Mother was yelling loudly at B.D. and cursing at him. Mother was walking quickly and B.D. had trouble keeping up. She saw mother "backhand[ ] the little kid somewhere on the head and the kid was knocked to the ground. It was a good hard hit to the kid. I heard the hit and I was about 20-25 feet behind them.... I went over to the lady and told her about hitting the kid."
Brittany C. reported she saw mother running to catch the light rail train. B.D. was running behind her. She started yelling at B.D. and "slapped the baby [B.D.] on the back of his head with the right hand. The baby fell to the ground.... The mother then picked the baby up and threw him to the bench."
Genevieve C. reported mother was in a hurry to catch the light rail train and B.D. was following behind, but could not keep up. Mother missed the train and cursed at B.D. Genevieve did not see mother hit B.D., but saw her throw him into the bench. Genevieve reported mother to the police.
James S. was standing across the street and saw mother running up the street with B.D. following. She looked at the light rail schedule then walked over to B.D. "and slapped the back of his head." He saw B.D. fall to the ground, but did not see her throw B.D.
On June 27, 2006, the social worker spoke with mother again. Mother was irate and three times "abruptly terminated" the phone call. On July 14, 2006, the 'social worker interviewed mother again. Mother denied the allegations in the petition, stating, "I never threw B[.D.] on or against the bench, and I never saw bruises on his cheeks either. The bloody nose, as I explained to the Police Officers, was because B[.D.] was getting over a cold."
Mother had her first visit with B.D. in June 2006. Visits were scheduled weekly. Mother ended visits earlier than scheduled and had cancelled two visits. During the first three visits, B.D. was fearful of mother and ran away from the visiting room. When mother would carry him, he would kick the mother and cry inconsolably. By the August report, B.D. was bonding and interacting more with mother.
The jurisdictional/dispositional hearing was set for September 2006. Mother filed a timely objection under section 355, subdivision (c)(1), to the admission of "all statements made by witnesses of the alleged incident, that occurred on or about June 20, 2006, that are included in both the Detention Report and the Jurisdictional/Dispositional Report. Specifically all statements made by an unidentified man in the Detention Report, from page 4 line 7 1/2 through line 11 1/2. Also, all statements made by witnesses to the alleged incident that appear in the Jurisdictional/Dispositional Report, from page 10 line 2 1/2 through line 25 1/2, which are attributed to witnesses identified only as Brittany [C.], Genevieve A. and James [S]."
At the September 2006, jurisdictional/dispositional hearing the court indicated it had "reviewed the detention report prepared for the initial detention hearing of the children and the jurisdictional and dispositional report prepared for the court date of August 17th, 2005." The parties submitted the matter without any testimony.
The court then stated mother's counsel had "made the appropriate 355 objections to every last statement by every witness of the (b-1) and (s-1) allegations, and I don't think I can bootstrap that, okay, I won't rely on one of these witnesses, but I'll rely on the conjunction of four witnesses whose *815 statements are objected to. And there's nothing independentthere's absolutely no other interviews with anyone. I don't have anything from the medical center indicating that the injuries observed on the child are consistent with the description of the witnesses. I simply have no evidence that is reliable and credible that the Court could sustain an (s-1) oran (s-1) or (b-1). [¶] On the (b-2) the Department pleads history. It's all history. And again, if I'm not relying on the statements from the witnesses that the mother had this outburst of anger where she was mistreating this child, then I'm just not sure what the precipitating incident is that the mother's history puts her in the position now of having the Court take jurisdiction over her children."
County counsel then sought to call mother to the stand. Mother's counsel objected. Minors' counsel noted she had specifically indicated she would be calling mother as a witness in her pretrial statement. The court then stated, "But you submitted your case onboth [county counsel] and [minors' counsel], you submitted your case on the reports before the court. I think [mother's counsel] is correct. That's why I asked if he had an objection. Now, we're down to rebuttal. I think my question was if there's anything in these reports that constitutes evidence to sustain these petitions? That's the answer I'm looking for. I think the objection's well stated, that the mother can't be called to rebut the lack of presentation of any further evidence. [¶] Soso the record is clear, I am going to sustain the objection and not have the mother testify as the matter has been submitted to the Court on the basis of the social worker's report by all counsel."
The court then went on to dismiss all three petitions. The minors were released back to mother's care and custody. B.D. remained a dependent of the court.

DISCUSSION

I.[**]

II.

The Trial Court Prejudicially Erred In Failing To Consider Independent Evidence In Addition To Witness Statements
Section 355 provides, in pertinent parts, "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence." (§ 355, subd. (a).) "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based...." (§ 355, subd. (b).) Subdivision (b) qualifies subdivision (a), "so that `legally admissible evidence' includes `hearsay evidence contained in' a `social study.' Furthermore, although subdivisions (c) and (d) limit the extent to which such social study hearsay evidence can be relied on exclusively, there is no limitation, except for fraud, deceit, or undue influence, on the admission of hearsay evidence." (In re Lucero L. (2000) 22 Cal.4th 1227, 1243, 96 Cal.Rptr.2d 56, 998 P.2d 1019, fn. omitted.) "Except in those instances recognized by statute where the reliability of hearsay is established, `hearsay evidence alone "is insufficient to satisfy the requirement of due process of law, and mere uncorroborated hearsay does not constitute substantial evidence. *816 [Citation.]"' [Citations.]" (Id, at pp. 1244-1245, 96 Cal.Rptr.2d 56, 998 P.2d 1019.) Section 355, subdivision (c)(1) incorporates this due process principle. (Id. at p. 1245, 96 Cal.Rptr.2d 56, 998 P.2d 1019.)
"When ruling in dependency proceedings, the welfare of the minor is the paramount concern of the court. [Citation.] The purpose of these proceedings is not to punish the parent, but to protect the child. [Citation.] As a person, the child's future is as vitally affected as is that, of the parties competing for his or her custody. [Citation.] Consequently, a trial court should not restrict or prevent testimony on formalistic grounds. On the contrary, the court should avail itself of all evidence which might bear on the child's best interest. [Citation.]" (Guadalupe A v. Superior Court (1991) 234 Cal.App.3d 100, 106, 285 Cal.Rptr. 570.)[3]
Here, the objection made to the statements of Brittany C, James S., Genevieve C. and Pamela E, did not render those statements inadmissible. Rather, the objection meant that uncorroborated, the hearsay statements did not constitute substantial evidence and could not be used as the exclusive basis for finding jurisdiction under section 300. (See In re Lucero L., supra, 22 Cal.4th at pp. 1244-1245, 96 Cal.Rptr.2d 56, 998 P.2d 1019.) The court found there was no independent evidence upon which it could rely to sustain a jurisdictional finding.
The question before us, then, is whether there was corroborating evidence in this record which could support the witnesses' hearsay statements sufficiently to sustain a jurisdictional finding. Corroborating evidence is "evidence supplementary to that already given and tending to strengthen or confirm it; additional evidence of a different character to the same point." (Black's Law Dictionary (5th ed.1979) p. 311.) In this context, corroborating evidence is that which supports a logical and reasonable inference that the act described in the hearsay statement occurred. (In re Cindy L. (1997) 17 Cal.4th 15, 35, 69 Cal.Rptr.2d 803, 947 P.2d 1340.)
There is no authority which addresses the quantum of corroboration necessary to support a jurisdictional finding after a section 355(c)(1) objection has been made. In the absence of such authority, we find the corroboration requirement of section 355, subdivision (c)(1), to be somewhat analogous to the rule in criminal law requiring independent corroborative proof of accomplice testimony. We find this to be an appropriate analogy, because as with the objected to hearsay in a social worker's report, the corroboration requirement of *817 accomplice testimony relates to the sufficiency of the evidence, not its admissibility. (People v. Riel (2000) 22 Cal.4th 1153, 1190, 96 Cal.Rptr.2d 1, 998 P.2d 969; In re Lucero L., supra, 22 Cal.4th at p. 1244, 96 Cal.Rptr.2d 56, 998 P.2d 1019.)
In the context of accomplice testimony, "[c]orroborative evidence, direct or circumstantial, is sufficient if it tends to connect defendant with" the crime even though it is slight and entitled, when standing by itself, to but little consideration [citations], nor does it need to establish the precise facts testified to by the accomplice. It is sufficient if it tends to connect the accused with the commission of the offense, and defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged. [Citations.] [¶] Moreover, defendant's own testimony and inferences therefrom, as well as the inferences from the circumstances surrounding the entire transaction, may be sufficient corroborative testimony. [Citations.] False or misleading statements to authorities may constitute corroborating evidence or as part of circumstances supportive of corroboration [citation], and '(a)lthough it has been said that corroboration is not sufficient where the circumstances are consistent with the innocence of the accused [citations], the more recent decisions have held that whether the corroborating evidence is as compatible with innocence as it is with guilt is a question of weight for the trier of fact [citations].' [Citation.]" (People v. Ruscoe (1976) 54 Cal.App.3d 1005, 1012, 127 Cal.Rptr. 6.)
Using these standards, there is evidence in this record which, if considered by the trial court, could have corroborated the statements of the four witnesses at the light rail station.
Mother made a number of statements regarding the incident at the light rail station. The statements were available to consider as corroboration. She stated she "tapped" B.D. on the back of the head. This statement was consistent with the statements of Pamela E., Brittany C. and James S. that mother struck B.D. in the back of the head. Mother also stated the women came up and talked to her about hitting her child. This is consistent with the statements of Pamela E. that she went over and spoke to mother about hitting her child. Mother's own statements then provide some corroboration of the witnesses' statements.
In addition, mother also offered a number of different explanations as to the cause of B.D.'s bloody nose. Mother claimed B.D. had a bloody nose because he was getting over a cold, because of the heat, and that she had been cleaning his nose and he had a scab. These three explanations are inconsistent with each other. Thus, it could be found that mother made false and misleading statements about the cause of B.D.'s bloody nose. If it were so found, this could also provide corroboration of the witnesses' statements.
The police officer noted a bump on B.D.'s forehead. The medical reports indicate a bruise on B.D.'s cheek and a bloody nose. There are a number of possible explanations for these marks on B.D., some of which are innocent. However, those innocent explanations do not eliminate the marks as potentially corroborative evidence of the witnesses' statements, rather those innocent explanations go to their weight.
Perhaps most compelling, however, is B.D.'s reaction to visits with his mother. *818 In the two years of reports previous to the light rail incident, all indications are that the interactions between B.D. and mother were appropriate. Following this incident, B.D. was clearly afraid of his mother. In the course of visits with his mother, he ran away from the visiting room and when she carried him, he would kick her and cry inconsolably. It would be reasonable to infer from this evidence that B.D. was afraid of his mother. This fear could corroborate, in part, the version of events provided by the witness statements.
All of this is evidence from which a reasonable inference could be drawn that the acts described by the witnesses' hearsay statements at the light rail station occurred. "The reviewing court examines the evidence to determine whether the corroboration required by statute has been proved; the weight to be given such evidence is for the" fact finder. (People v. Parker (1965) 235 Cal.App.2d 86, 96, 44 Cal.Rptr. 900.)
"[T]he appropriate standard of review is for this court to determine whether the trial court's order was supported by substantial evidence. Substantial evidence is evidence that is `reasonable, credible, and of solid value' such that a reasonable trier of fact could make such findings. [Citation.] [¶] It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence;; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses. [Citation.] `Issues of fact and credibility are questions for the trial court.' [Citations.] It is not an appellate court's function, in short, to redetermine the facts. [Citation.]" (In re Sheila B. (1993) 19 Cal.App.4th 187, 199-200, 23 Cal.Rptr.2d 482.)
It appears the court here mistakenly believed it could not consider the four witnesses' statements at all. As delineated above, the evidence could be considered, it just could not, by itself, form the basis for a jurisdictional finding. Also as delineated above, there was independent evidence which corroborated the witnesses' statements. Accordingly, we find the trial court erred in dismissing the petition without considering the witness statements in light of the corroborating evidence. However, because "issues of fact and credibility are questions for the trial court" we will remand this matter for further jurisdictional proceedings. (In re Christina T. (1986) 184 Cal.App.3d 630, 639-640, 229 Cal.Rptr. 247.)

DISPOSITION
The juvenile court's order is reversed and the matter is remanded for further jurisdictional proceedings consistent with this opinion.
We concur: DAVIS, Acting P.J., and RAYE, J.
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part I.
[1] Further undesignated statutory references are to the Welfare and Institutions Code.
[2] The record revealed that the auditory hallucinations were the result of a particular medication which was prescribed.
[**] See footnote *, ante.
[3] We note, although it is not entirely clear from this record, it appears that minors' counsel sought to put mother on the stand after the court indicated it did not believe there was sufficient evidence to sustain a jurisdictional finding. The ruling of the court suggests it understood minors' counsel to be making such a request. To the extent minors' counsel was seeking to have mother called to testify, "section 350, subdivision (c) specifically provides at any hearing where the Department has not carried its burden of proof, minors' counsel `may offer evidence without first having reserved that right' before any order is made. The refusal to permit minors' counsel to present evidence is inconsistent with the mandate to fully protect the interest of the minor. (Guadalupe A. v. Superior Court l supra,] 234 Cal.App.3d [at p.] 107, 285 Cal.Rptr. 570.) We view the legislative scheme as affording minor[s'] counsel great latitude in presenting pertinent information to the court so as to assure the most appropriate resolution for the minor[s]." (Allen M. v. Superior Court (1992) 6 Cal.App.4th 1069, 1075, 8 Cal.Rptr.2d 259.) Accordingly, the court should have allowed minors' counsel to call mother as a witness before it dismissed the petitions for insufficient evidence.