Filed 1/20/16  In re K.G. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| In re K.G. et al., Persons Coming Under the Juvenile Court Law. | C078040 |
|---|---|
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, Plaintiff and Respondent, v. CARMEN M. et al., Defendants and Appellants. | (Super. Ct. Nos. JD230742, JD234595, JD234596) |

Carmen M., mother, and Jose R., father of Angel R. and J.R., appeal from the judgment of disposition.  (Welf. & Inst. Code, § 395.)[1]  Father argues there was insufficient evidence to support the finding that he molested mother's daughter, D.M.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

Father further argues that, even if the evidence supports a finding that he sexually abused D.M., and that mother's second daughter, K.G., is at risk of sexual abuse, there is no evidence that the two boys, Angel R. and J.R., are at risk of sexual abuse. Mother contends there was insufficient evidence to support either the finding that the minors came within the provisions of section 300 or the order removing the minors from her custody. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Sacramento County Department of Health and Human Services (the Department) filed a petition in April 2014 to remove the three minors, K.G. (age four), J.R. (age 18 months), and Angel R. (age five months), based on allegations that (1) mother knew or should have known that Jose R. had sexually abused the minors' older half sibling, D.M. (age six); (2) mother did not believe D.M.'s disclosure of the abuse; and (3) mother remained in a relationship with Jose R. and continued to allow him access to the minors.[2] The petition further alleged that mother had failed to reunify with five older half siblings of the minors, including D.M., and that Jose R. had a history of being abusive to mother and threatened to harm her if she severed their relationship.

The declaration for the protective custody warrant said the Department responded to a referral in April 2014 that D.M. made multiple disclosures of sexual abuse by Jose R., which included touching her and her sister multiple times while they were in bed, rubbing his penis against their faces and bottoms and that mother saw the abuse occurring once and told Jose R. to stop. D.M. participated in a Special Assault Forensic Evaluation (SAFE) interview and disclosed sexual abuse by Jose R., which included touching her vagina over and under her clothes, oral copulation and rubbing his penis on K.G.'s face

---

[2] The minors D.M. and K.G. have different fathers from the two youngest children. D.M. is not a subject of this appeal.

and mouth. Following the SAFE interview, D.M. was separately interviewed at home by a Sacramento County deputy sheriff. The same day, the social worker also interviewed D.M., who said she did not like talking about the abuse because it made her feel like throwing up. D.M. told the social worker she did not want to visit mother anymore because mother brought Jose R. and she could see his blue truck which made her feel sad. D.M. was also sad because her mother did not believe her. The social worker interviewed mother, who thought D.M.'s allegations were false and that D.M. was coached by her biological father and paternal aunt. Mother told the social worker she believed D.M.'s paternal relatives were trying to keep the minor from her and initially denied any concerns about Jose R. abusing the children, but later admitted she had reported concerns in January 2013 that Jose R. was molesting K.G. and that she had taken K.G. to the hospital for an examination as a result. Mother denied being afraid of Jose R. and insisted that the mandated reporter she had asked about assistance to get into a WEAVE safe house due to Jose R.'s threats had misunderstood her statement. Mother took the minors to stay with the maternal grandmother who did not believe D.M.'s allegations of sexual abuse. The social worker interviewed K.G. who disclosed verbal, but not sexual, abuse.

The detention report reiterated the substance of the declaration for the protective custody warrant. The report stated that D.M. had disclosed that Jose R. touched her and her sister while they were in bed and rubbed his penis on their faces and bottoms. On April 17, 2014, the social worker placed the three minors (K.G., Angel R. and J.R.) in protective custody. At the detention hearing, K.G. was placed with her father under the supervision of the Department while Angel R. and J.R. were detained.

The Department filed the jurisdiction/disposition report in June 2014. The report stated that the social worker again interviewed mother who continued to say that D.M.'s sexual abuse allegation was false and denied that Jose R. did anything to K.G. Mother

3

now believed that something had happened to D.M. but it did not happen while D.M. was in her care because she did not leave D.M. alone with Jose R. unless she was showering. The social worker also interviewed Jose R. who denied sexual abuse of either girl. The report summarized D.M.'s SAFE interview. In the interview, D.M. said that mother told her not to tell about Jose R. D.M. said Jose R. touched her on her privates and touched her sister too. It happened while her mother was in the shower and their mother did not believe them. D.M. said she told her aunt and the social worker because the social worker said she would protect her. She said that she and her sister were in a crib together, when Jose R. pulled up her nightgown and touched them. D.M. said the abuse happened more than once but she did not know how many times. D.M. described an incident when Jose R. touched her butt on the inside with a stick that came from outside and had tiny eyes. D.M. also said that Jose R. put his " 'front part' " on her and her sister's mouth. Jose R. also touched her in her private with his front part then put his pants back on. She was lying on her bed when her mother was cooking breakfast, Jose R. was leaning against the crib with a short side instead of a tall side when he touched her lips with his front part.

The jurisdiction/disposition report chronicled multiple visits between mother and the minors from May 2014 to June 2014 and noted the Department's concerns. On May 5, mother said she did not understand why K.G. bit J.R. When reminded that she had told the Department that K.G. had always been doing things to him, mother's behavior changed from positive to angry and agitated, pacing, holding the children over her arm, pulling their clothes down and inspecting them. She tried to blame the bite marks on the other foster children in the home but those children were older and would not have bitten J.R. The social worker told mother K.G. admitted biting J.R. because she

4

did not like him.[3]  Mother had to be encouraged to interact with the minors and the social worker modeled appropriate behavior for her.  When Jose R. visited, he also started to complain about the biting until it was explained to him, and thereafter he engaged the minors.  On May 10, the parents spent the majority of their time examining the minors and complaining that the minors had bruises.  Mother wanted the minors moved to a different foster home and did not want the minors in a " 'black' " foster home.  Mother called police and complained about abuse in the foster home.  The police examined the minors and determined the allegations were false.  Both parents had difficulty interacting with the minors.  On May 15, mother called and left a message that she was upset because the minors had not been moved to a different foster home.  The parents continued to struggle to interact with the minors at their level and spent the majority of their time complaining.  The parents had difficulty transitioning at the end of visits, trying to hold onto the minors so they would not want to leave.  Jose R. taunted the minors with toys he brought but withholding the toys at the close of the visit, causing the minors to cry.  Mother spent her time complaining and trying to talk to the visit monitor rather than interacting with the minors.  On May 17, the parents continued to have difficulty interacting with the minors; mother was again complaining and spent most of her time examining the children.  On May 20, mother continued to complain about the "CPS system" and had to be encouraged to interact with the minors.  May 22, mother continued to allege the minors were injured or make other complaints about the foster placement.  Both parents spent much of the visit undressing, examining and dressing the minors.  On May 29, mother became emotional about the minors' condition and overstayed her visitation time.  Father also became agitated at the end of his visit.  On June 3, mother was again concerned about possible injuries to J.R., who actively avoided being

---

**3**  K.G. was removed from the foster home placement and placed with her father in April 2014.

5

undressed for a body check. On June 5, mother did not play with K.G. during her visit and was more worried about photographing the two boys and discussing their marks. Mother again tried to undress J.R. to do a body check.

An addendum filed in August 2014 provided information on disposition. The addendum concluded that the juvenile court should provide services to mother but bypass services as to Jose R. pursuant to section 361.5, subdivision (b)(6) due to his sexual abuse of D.M., the severity of the abuse, and his failure to acknowledge the risk to the minors.[4]

The contested jurisdiction/disposition hearing commenced August 29, 2014, with viewing of the SAFE interview of D.M. that occurred April 14, 2014. It was then continued to September 3, 2014.

D.M.'s therapist testified D.M. had been her client since October 2013. D.M. was referred for therapy by her father and stepmother due to D.M.'s sexualized behavior resulting from sexual abuse, which had occurred much earlier. D.M. had previously identified mother, mother's friends and her father, John M., as perpetrators of the abuse. However, during the therapist's interview with D.M., the child said her mother and father were not perpetrators. The therapist testified D.M.'s symptoms included nightmares, not wanting to be in bed when any adult was in the room, rejecting the presence of the male in the home and being preoccupied with her safety, all of which indicated some trauma. The therapist used trauma-focused integrative play therapy. After specifying the trauma, the therapy is designed to identify triggers and process them. The therapist and D.M. were able to identify triggers: a blue truck and an individual named Jose. D.M. never identified other perpetrators or triggers. D.M. was able to draw pictures about, and

---

[4] At the same time, the Department filed a report recommending that K.G. be detained from her father's home due to his relapse into methamphetamine use and his refusal of services. The Department filed amended petitions to add these allegations. K.G. was detained on the amended petition.

6

explain, the sexual abuse including herself and her sister in a crib, mother in the shower, Jose R. touching her and pulling down her pants and her mother coming out of the shower saying "those are my kids." D.M. identified a lot of fear and drew about her aunt and father providing her support. D.M. benefitted from therapy and her symptoms decreased in intensity and frequency. She did have a setback when mother visited D.M.'s home with Jose R. and new symptoms of vomiting, fears of sleeping alone, and continuing to ask if she was safe in the house surfaced. D.M. told the therapist she was very scared of seeing the blue truck and did not want to see Jose R. D.M.'s improvement after therapy treated her triggers indicated that D.M. knew exactly what she needed to work out. The therapist testified she could not determine whether a child had been coached, but in D.M.'s case, had she been coached, something would not have added up but it did because D.M. identified triggers and worked through them. The therapist testified it was not possible to make progress in therapy if the sexual abuse had not occurred because the client would not be able to identify correct triggers. The therapist stated it was common for a young child to name multiple perpetrators then narrow it down as they felt safe. During D.M.'s treatment, the therapist spoke to mother and, in one conversation, told her that D.M. said she was being sexually abused by Jose R. Mother told the therapist she believed it was a lie.

Penny Williams, the social worker, testified she received a referral in December 2013 that D.M. was in therapy and had disclosed sexual abuse. There was an ongoing informal supervision case open at the time due to D.M.'s sexualized behavior. In September 2013, D.M.'s father had full custody and Williams provided courtesy visits to mother after September 2013, supervised by the paternal aunt. Williams interviewed D.M., who said she was sexually abused by Jose R. D.M. gave details, e.g., she and her sister were sexually abused in a crib and on the bed, her mother was taking a shower, and she told her mother what happened. D.M. could not tell Williams when the abuse

7

occurred, but said she was afraid. Williams was aware of an earlier investigation in which D.M. had identified mother, mother's friends and John M. (her father) as persons who had touched her. Williams told mother of the current disclosure that Jose R. had sexually abused D.M. Mother said it seemed like D.M. had been coached and that she did not believe her. In early 2014 there were additional referrals. In the first one with new information, D.M. told Williams that her mother and Jose R. came to the door of her aunt's house where D.M. was living and it frightened her. Williams met with D.M. at home and D.M. showed Williams how she reacted when she saw her mother and Jose R. at the front door. D.M. demonstrated that she ran into the kitchen, went under the table and said she threw up when she saw Jose R. D.M. also told Williams about the crib, a stick that Jose R. got from outside, and her mother in the shower. D.M. said the stick went to her buttocks and that Jose R. would feel her private part through her pajamas. Williams tried to set up a safety plan with mother to keep Jose R. away from D.M. because the child was being retraumatized but mother acted like the minor was being coached and would not sign the plan. Williams had told mother Jose R. should not be around D.M. due to the ongoing investigation. Mother initially denied bringing Jose R. to D.M.'s home and said D.M. did not see a blue truck but later admitted it to another investigator. Mother was protecting Jose R., not D.M. Williams concluded the referral about D.M.'s sexual abuse was substantiated after the SAFE interview because there was new information and her disclosure was detailed. Williams testified that law enforcement declined prosecution on earlier disclosures because they felt D.M. was not credible due to her age and the belief she was coached. Williams's own opinion was that the earlier referrals were inconclusive. Williams was not aware of any hostility on the part of the paternal aunt toward mother or of any financial motive to keep D.M. in her home. Williams believed the paternal aunt was a well-intended, caring relative.

8

John M., D.M.'s father, testified that the paternal aunt currently had custody of D.M. John M. testified there was a prior dependency proceeding regarding D.M. and he was awarded custody when it terminated. Mother had supervised visits, which transitioned to unsupervised, then a few overnight visits prior to the informal supervision case in September 2013. He testified that D.M. did not have problems before she met Jose R. He stopped mother's visits when the social worker told him to.

At the close of the Department's evidence, counsel for mother and Jose R. moved to dismiss the petition pursuant to section 350, subdivision (c) on the grounds that the Department had not met its burden of proof. The court denied the motion, finding it was improbable that D.M.'s father had the mental capacity to coach her and the paternal aunt had no motivation to do so. Further, D.M. did not exaggerate or expand what happened when invited to do so and her lack of precision weighs against coaching. The court acknowledged D.M. made some inconsistent statements and the disclosure of the stick and what it represents was a mystery. The court observed it was not uncommon for children to distance themselves from abuse by exercising imagination. The court further stated that D.M.'s demeanor was not rehearsed and key aspects of her disclosures were consistent in the various statements to social workers, her therapist, and the SAFE interview as well as her retraumatization when exposed to the identified triggers. The court found that D.M.'s identification of multiple perpetrators did not lead to a conclusion that she was lying. Overall, the court found that D.M. presented in "her demeanor, manner, and responses consistent with credibility and truthfulness." The court found it significant that mother insisted D.M.'s allegations were false but had serious concerns herself in January 2013 about Jose R. molesting K.G. The court concluded the Department had met its burden.

Jose R. testified he did not sexually abuse either D.M. or K.G.

9

Mother testified D.M. was around Jose R. two or three times, she never saw him touching her or K.G. inappropriately, and had no reason to believe he did so. Jose R. lived with her from October 2012 until April 2014. During D.M.'s visits, Jose R. was alone with the minors when she showered but she took the baby monitor with her so she could hear. She did not recall saying she was afraid Jose R. might have molested K.G. Mother testified she never said she was afraid of Jose R. nor that he threatened her, and K.G.'s father lied when he said that she had. Mother testified she did not believe Jose R. molested D.M. She believed that D.M. was coached by her father and the paternal aunt. Mother described the crib and said D.M. never slept there, but in a toddler bed. Mother said it was impossible for Jose R.'s genitals to be in the crib even with the side down.

M.A., D.M.'s stepmother, testified D.M. came to live with them in 2011. At that time, she was very clingy, lacked personal space, and had no boundaries. Over time, her concerns about D.M. grew as the child exhibited sexualized and bizarre behavior. D.M. was in therapy working on boundaries and M.A. felt there was a sexual component because D.M. was very curious about seeing other people's body parts. D.M. made some improvement and the initial therapy was terminated. As D.M.'s behaviors continued, M.A. suggested that John M. contact mother to see if she could help. Mother had been visiting somewhat inconsistently but after John M. contacted mother about D.M. there was a visitation arrangement. When D.M. returned from visits with mother, she had behavioral problems. Near the end of her relationship with John M., M.A. began to have concerns about him contributing to D.M.'s sexualized behavior, such as laying down for a nap with D.M. behind a closed door and constant hugging and cuddling with her. M.A. made sure John M. was not present during D.M.'s bath time. John M. had previously been in the bathroom or showered with D.M. John M. also displayed troubling behaviors toward their daughter when she was born. Before the Department's involvement, D.M. did tell her she had been sexually abused. After a sexualized incident with M.A.'s young

son in the fall of 2013, D.M. told M.A. she had touched both M.A.'s young son and daughter and then disclosed that John M. had sexually abused her in various ways. At that point, D.M. also began identifying her mother's friends as other perpetrators. M.A. confronted John M. in D.M.'s presence. He denied any sexual contact with D.M. who insisted that he had done so and said he was lying. After that she did not leave D.M. alone with John M. She contacted the Department but was dissatisfied because there was not a thorough investigation and the allegations were rapidly dismissed. M.A. felt that something happened to D.M. even before mother was involved with Jose R. M.A. said she had met Jose R. many times in the context of visitation exchange when he and mother came to the home in a blue truck. D.M.'s visits with mother were supervised after D.M. went to live with the paternal aunt. M.A. stated that one of the things she was working on with D.M., when D.M. lived with them, was lying. D.M. started getting a lot better about that toward the last six months they were together. D.M. started taking accountability for the things she said and did and would be honest. M.A. testified that D.M. was being truthful when she was describing what John M. did to her. D.M.'s behavior worsened after the overnight visits with mother. When D.M. began treatment with the current therapist, M.A. took her to a few sessions then D.M. went to live with the paternal aunt who went to sessions with her.

After hearing testimony and argument, the court took the matter under submission. The court issued its ruling on jurisdiction on November 7, 2014. The court reviewed the evidence noting mother's continued denial that Jose R. sexually abused D.M. and her belief that the paternal aunt had coached D.M. However, the evidence showed mother was herself concerned that Jose R. was sexually abusing K.G. Mother eventually stated she believed D.M. was sexually molested, but not by Jose R. Jose R. denied sexually abusing D.M. and said he was alone with the minors only when mother was in the

11

shower. Mother remained in a relationship with Jose R. and denied there was domestic violence in the relationship.

The court then reviewed the hearsay objections made both before and after the section 350, subdivision (c) motion. The court found that the social worker who prepared the reports was available for cross-examination as were those whose statements appeared in the reports. Both the social study and the SAFE interview were admissible because the social worker and D.M. were available for cross-examination. The court further found D.M.'s statements, including those made to her therapist, could be used, pursuant to section 355, subdivision (c)(1)(D), to support jurisdiction and that the parents had notice of the statements and an opportunity to subpoena D.M. The court discussed the reliability of D.M.'s statements at length and reaffirmed its decision to admit D.M.'s statements to the therapist. The therapist's observations and opinions were admissible as nonhearsay and provided corroboration for D.M.'s statements.

The court reiterated the credibility determinations made when ruling on the section 350, subdivision (c) motion, finding social worker Williams credible and that nothing subsequent to the motion undermined her credibility. The court continued to find the minor's therapist credible as well and reviewed the essentials of her testimony. The court found the testimony of John M., D.M.'s father, not credible due to several issues, including memory impairment, although John M. roughly corroborated some of D.M.'s overnight visits with mother. Jose R.'s testimony was too brief to assess for credibility, but was consistent with his prior denials. The court assessed mother's testimony as rambling and tangential with numerous inconsistent statements. Her testimony was evasive and not credible at several points, leading the court to give little weight to her testimony. The court found stepmother M.A. to be genuine and credible and gave significant weight to her testimony.

12

The court also reviewed the exhibits, which included the social worker's chronological notes and police reports, commenting on the evidence therein. The court gave little weight to the conclusion by the sheriff's department sergeant, found in one of the chronological notes in February 2014, that D.M.'s statement of sexual abuse was not credible, because there was no information to support the sergeant's conclusion. The court noted the difference between the minor's disclosure of sexual abuse by John M. and sexual abuse by Jose R. The court came to the conclusion that the minor was telling the truth about sexual abuse by John M., separate from that by Jose R., and that she did not mention it in the SAFE interview because she was there to talk about Jose R. The court found that D.M. was consistent on key details throughout her interviews with several police officers, multiple social workers, the therapist, and the SAFE interview as to each perpetrator of sexual abuse.

The court concluded that, based on the totality of evidence presented, D.M. was credible. The court had "every reason to believe" that John M. sexually abused D.M. but that did not mean that Jose R. did not. Moreover, based on mother's report of an unnamed perpetrator, there may have been a number of other perpetrators. The court found D.M.'s statement corroborated by social worker Williams, the therapist, and stepmother M.A. The court found no evidence of coaching. The court found by a preponderance of the evidence that Jose R.'s conduct as to D.M. did come within the provisions of section 300, subdivision (d); however, there was no evidence he sexually abused his two biological children, Angel R. and J.R., and the evidence of sexual abuse was insufficient as to K.G.

The court then discussed the evidence in light of factors set forth in *In re I.J.* (2013) 56 Cal.4th 766. As to Angel R. and J.R., the court sustained only the section 300, subdivision (j) allegation. The allegation was modified to read that the minors were "at substantial risk of abuse or neglect in that the half sibling, [D.M.], was sexually abused

13

by [Jose R.], the father of Angel [R.] and [J.R.]  The acts include, but are not limited to, fondling the child [D.M.'s] vagina over and under the clothing and touching his penis to the outside of [D.M.'s] lips.  [M]other was advised on more than one occasion of [D.M.'s] disclosure of sexual abuse by [Jose R.] and was instructed not to bring [Jose R.] to visits with [D.M.]  [Mother] is adamant the child is lying and continues to periodically be in a romantic relationship with [Jose R.]  Mother, aware of the allegations by [D.M.] of sexual abuse, brought [Jose R.] to a visit with [D.M.] resulting in the child being retraumatized and distressing the child to the point of regression in therapy.  [M]other allows [Jose R.] access to all the children in her care.  [Mother's] dismissal and [Jose R.'s] denial of [D.M.'s] allegations.  And [mother's] indifference to [D.M.'s] emotional well-being demonstrates an inability of either parent to protect the [children] from substantial risk of sexual abuse . . . and/or neglect and places the [children] at substantial risk of physical harm, sexual and emotional abuse and neglect."

As to K.G., while the court found insufficient evidence that K.G. was molested by Jose R., the court did sustain the section 300, subdivision (d) allegation "due to the totality of circumstances as she is at or near the same age as when [D.M.] was molested. She is not the biological child.  She is female.  And there is some evidence that there is an inability to protect on the part of [mother]."[5]  The court also sustained the subdivision (j) allegation as to K.G. as previously modified for the other minors.

---

[5] The section 300, subdivision (d) allegation was modified to read:  "The child, [K.G.], . . . is at substantial risk of sexual abuse, and the child's mother, Carmen [M.], has failed to protect the child, as she knew or reasonably should have known that the child was in danger of sexual abuse in that the half sibling, [D.M.], was sexually abused by [Jose R.], the mother's boyfriend and father of the two younger children, and periodically a member of the child's household.  The acts include, but are not limited to, fondling the child [D.M.'s] vagina over and under the clothing, and [Jose R.] touching his penis to the outside of [D.M.'s] lip.  The child, [K.G.], denies she has been sexually abused, however, the mother took the child for a medical exam regarding the alleged sexual abuse in 2013 and the half sibling, [D.M.], has repeatedly alleged [K.G.] was also sexually abused by

14

At the disposition hearing in November 2014, the court adjudged the minors dependents, removed the minors from parental custody, placed them with the maternal grandmother, and ordered reunification services for mother and Jose R.

## DISCUSSION

The parents contend there was insufficient evidence to support the juvenile court's jurisdiction findings and the removal order.

When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible, and of solid value—to support the conclusion of the trier of fact. (*In re Angelia P*. (1981) 28 Cal.3d 908, 924; *In re Jason L*. (1990) 222 Cal.App.3d 1206, 1214.) In making this determination, we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact. (*In re Jason L.*, *supra*, 222 Cal.App.3d at p. 1214; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16.) The reviewing court may not reweigh the evidence when assessing the sufficiency of the evidence. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.)

---

[Jose R.] [¶] Additionally, the mother was advised on more than one occasion of [D.M.'s] disclosure of sexual abuse and was instructed not to bring [Jose R.] to visits with [D.M.] [Mother] is adamant the child, [D.M.], is lying and continues to periodically be in a romantic relationship with [Jose R.] The mother, aware of the allegations by [D.M.] of sexual abuse, brought [Jose R.] to a visit with [D.M.] resulting [in] the child being retraumatized and distressing the child to the point of regression in therapy. [M]other allows [Jose R.] access to [K.G.] [M]other's dismissal of [D.M.'s] allegations and indifference to emotional consequences to [D.M.] demonstrates an inability to protect [K.G.] from the substantial risk of sexual abuse."

15

## I. Jurisdiction

### A. *Jose R.'s Arguments Regarding Jurisdiction*

Jose R. contends there was insufficient evidence to show that he sexually abused D.M. and the juvenile court could not have sustained the section 300, subdivision (j) allegations as to Angel R. and J.R. His argument attacks D.M.'s credibility, citing the inconsistencies in her statements and motives of adults to coach her. He also argues D.M.'s hearsay statements were not corroborated as the corroborative evidence was, itself, hearsay.

1. Evidence that D.M. was sexually abused by Jose R.

The juvenile court found D.M.'s therapist, the social worker Williams, D.M., and D.M.'s stepmother, M.A., credible. The juvenile court also found D.M.'s hearsay statements regarding Jose R.'s sexual abuse were reliable and consistent. The statements and testimony from these witnesses establish that, during the time D.M. was living with her father and stepmother, she had overnight visits with mother and Jose R. During the overnight visits, on at least one, and possibly more, occasions Jose R. was alone with D.M. and committed acts of sexual abuse on her, including touching her vagina over and under her clothes and touching her mouth with his penis. D.M. told mother, but mother did not believe her although mother had suspected Jose R. of sexually abusing K.G. D.M. disclosed the sexual abuse to the social worker, police officers, her therapist and the SAFE interviewer. D.M. had disclosed what were apparently conflicting accounts of sexual abuse; however, in light of stepmother M.A.'s testimony, the court reasonably resolved the conflict by concluding that D.M. had, in fact, been sexually abused by both John M. and Jose R. and that her statements about each separate perpetrator's behaviors were consistent as to that abuse.

Mother and Jose R. continued to deny Jose R. had sexually abused D.M. and insisted the child had been coached. The court, based upon its observations of John M. and Williams's assessment of the paternal aunt, concluded John M. lacked the capacity to

16

coach the minor and the paternal aunt lacked a motive to do so. Further, the court carefully reviewed D.M.'s statements about Jose R. and concluded that the statements themselves did not support a finding that she had been coached.

    2. <u>Corroboration of D.M.'s hearsay statements</u>.

    Except where the reliability of hearsay is established, due process requires corroboration of hearsay evidence to constitute substantial evidence to support jurisdiction. (*In re B.D.* (2007) 156 Cal.App.4th 975, 983-984; § 355, subd. (c)(1).) The corroboration requirement relates to the sufficiency of the evidence, not its admissibility. (*In re B.D.*, *supra*, 156 Cal.App.4th at p. 984.) Corroborative evidence is "sufficient if it tends to connect" the perpetrator with the act "even though it is slight" and on its own is entitled to little consideration. (*Ibid.*)

    The juvenile court found that much of the hearsay in the social worker reports, the SAFE interview, and statements made to the therapist came within the statutory exception of section 355, subdivision (c)(1)(D)[6] because the social worker and D.M. were available for cross-examination. Nonetheless, there was nonhearsay evidence that corroborated D.M.'s statements.

    First is the therapist's testimony that D.M. identified triggers as the blue truck and Jose R. and when those triggers were addressed in therapy, her symptoms decreased. Further, when retraumatized by those triggers, D.M. regressed. The therapist was clear

---

[6] Section 355, subdivision (c)(1)(D) provides: "If a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more of the following exceptions: [¶] . . . [¶] (D) The hearsay declarant is available for cross-examination. For purposes of this section, the court may deem a witness available for cross-examination if it determines that the witness is on telephone standby and can be present in court within a reasonable time of a request to examine the witness."

that it was not possible to make progress in therapy if the sexual abuse had not occurred because the client would not be able to identify the correct triggers; however, D.M. had identified her triggers, worked through them, and improved. And, second, when Williams spoke to D.M. about the incident when mother and Jose R. came to the door of the paternal aunt's home where D.M. lived, D.M. showed Williams how she had reacted. Williams's nonhearsay observations of D.M.'s fear reaction also corroborated D.M.'s hearsay statements. (See, e.g., *In re B.D.*, *supra*, 156 Cal.App.4th at p. 986.) The nonhearsay evidence amply corroborated D.M.'s hearsay statements.

    3. <u>Findings that Angel R. and J.R. came within section 300, subdivision (j).</u>

Relying on the recent Supreme Court decision *In re I.J.*, *supra*, 56 Cal.4th 766, Jose R. argues that, even if substantial evidence supports the finding that he sexually abused D.M., the evidence does not support a finding that the two boys, Angel R. and J.R., are at risk of similar abuse and thus come within the provisions of section 300, subdivision (j).[7]

In *I.J.*, the court addressed the question "whether a father's sexual abuse of his *daughter* supports a determination that his *sons* are juvenile court dependents when there is no evidence the father sexually abused or otherwise mistreated the boys, and they were unaware of their sister's abuse . . . ." (*In re I.J.*, *supra*, 56 Cal.4th at p. 770 [original emphasis].) The court examined the factors in subdivision (j) concluding that "the more

---

[7] Section 300, subdivision (j) provides, in relevant part: "The child's sibling has been abused or neglected, as defined in subdivision (a) [(infliction of nonaccidental injury)], (b) [(physical harm as a result of failure to supervise or protect)], (d) [(sexual abuse)], (e) [(child under the age of five has suffered severe physical abuse)], or (i) [(child subjected to acts of cruelty)], and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings." (*In re I.J.*, at p. 778.) The court explained that " '[s]ome risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . [¶] . . . [¶] . . . Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .' " (*Ibid*.)

The juvenile court was well aware of the *I.J.* standard and discussed it at length in its ruling. The court had found that D.M. was sexually abused within the meaning of section 300, subdivision (d). The court considered the sex of the minors, the ages of the minors, the age of the victim, D.M., the nature and severity of the abuse, mother's inability to protect the minors, mother's conduct in retraumatizing D.M., and mother's concerns and recanting of possible sexual abuse of K.G. coupled with adamant denials that Jose R. sexually abused D.M.

The minors were at, or younger than, D.M.'s age when she was sexually abused. The abuse was significant, but was denied by both Jose R. and mother. While D.M.'s abuse occurred out of mother's presence, there was no effort by Jose R. to shield his actions from the other minors and there was some evidence K.G., at least, was present, thereby potentially traumatizing the sibling. Mother made no effort to protect the minors by limiting Jose R.'s access to them after she was aware of D.M.'s allegations and was indifferent to the emotional consequences to D.M. of Jose R.'s presence at visits, suggesting that mother lacked the ability to protect the other minors. The possible harm was potentially high; thus, even if the probability of occurrence was low, the risk of harm to each of the minors—a daughter and two sons—of either actual abuse or trauma arising from a sibling's abuse, was significant. Substantial evidence supported the court's finding that the section 300, subdivision (j) allegations applied to all three minors.

19

## B. *Mother's Arguments Regarding Jurisdiction*

Mother recognizes that we need find only one ground is supported by substantial evidence to affirm the juvenile court's exercise of jurisdiction over the minors and does not challenge the juvenile court's jurisdictional findings as to either father. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.) Mother asks this court to exercise its discretion to reach the merits of her substantial evidence challenge to the juvenile court's jurisdictional findings as to her.

Principles of justiciability generally operate to deny review of an issue where no relief can be granted that would have a practical, tangible impact on a parent's position in the dependency. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1490.) Review of the evidentiary basis for one allegation supporting dependency jurisdiction where a second allegation, which also supports dependency jurisdiction, remains unchallenged is such an issue. (*Id.* at p. 1491.) However, the court may exercise its discretion to reach the merits of a challenge to any jurisdictional finding "when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citation]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction.' " (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 [substantial evidence to support allegation was addressed where it could mean the difference between father's being an offending parent versus a nonoffending parent]; see *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1316 [jurisdictional findings could impact consideration of father for placement].)

Mother argues that the outcome of her appeal is the difference between her being an offending versus a nonoffending parent, which could have a negative effect on the current and future dependencies. Mother does not explain what impact it would have in the current appeal since the court ordered services for her. Further, mother's argument ignores her significant history of prior dependencies that resulted in the failure to reunify

with six of her children, including D.M. and K.G. While the prior dependencies were founded in mother's substance abuse, and did not operate to bar services in this dependency, it is mother's failure to protect her children from abuse and neglect that impacts all the dependencies. In any case, the possible existence of a future dependency is speculative at best. We decline to exercise our discretion to address mother's challenge to the court's jurisdictional findings as to her.

## II. Removal of the Minors

Mother argues there was insufficient evidence to support removal of the minors from her custody.

Mother was a custodial parent for Angel R. and J.R., thus, the court had to find clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) Additionally, because mother was the noncustodial parent of K.G., the court was required to place K.G. with her unless it found that placement with her "would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Under either standard, there was ample evidence to continue out-of-home placement for the three minors.

The minors are at risk because mother still denies D.M. suffered sexual abuse by Jose R. and insists she was lying or coached. Further, mother continues to have contact with Jose R. Mother demonstrates an inability or indifference to protecting the minors from sexual abuse and/or emotional trauma. Mother brought Jose R. to visits with D.M. after having been told not to do so and denied she had done it. The visitation logs between mother and the minors are replete with instances of mother's concern for her own needs while ignoring the minors' needs for her care and companionship. Until

21

mother participates in, and benefits from, services designed to improve her parenting and resolve her own issues, the minors would be at risk in her care.

## DISPOSITION

The judgments (dispositional orders) are affirmed.


             BUTZ           , J.


We concur:


     NICHOLSON    , Acting P. J.


     MAURO       , J.

22