Filed 5/17/22  In re Ja.M. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Ja.M., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CASEY M.,<br><br>        Defendant and Appellant. | A163596<br><br>(Alameda County<br>Super. Ct. No. JD-033294-01) |

Casey M. (Father) appeals from jurisdiction and disposition orders in a dependency matter concerning his child, Ja.M.  Father argues that the evidence does not support the juvenile court's jurisdiction order, and that the court failed to state specific facts supporting its removal order as required by Welfare and Institutions Code section 361, subdivision (e).[1]  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Father appeals from the orders of the juvenile court concerning Ja.M., but not Ja.M.'s older sibling, Je.M.  That said, Ja.M.'s dependency matter was preceded by an incident involving Je.M., and once the family came to the

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

attention of the Alameda County Social Services Agency (Agency), the children's cases proceeded in a largely consolidated fashion. The juvenile court admitted reports concerning both of the children at the joint contested jurisdiction and disposition hearing at the heart of this appeal. As such we will set out facts concerning Je.M. here, as relevant to this appeal. For additional context, we set out facts concerning Mother, though she does not appeal from the orders at issue.

### A. The Initial Proceedings Involving Je.M.

In January 2021, deputies from the Calaveras County Sheriff's Office were dispatched to assist 16-year-old Je.M., who was seeking help because of Father. Je.M. reported Father had been rambling nonsensically, talking about meteors striking Earth and living in a mineshaft, and telling Je.M. to drive a truck Father had stolen to Idaho despite Je.M. being unlicensed. Je.M. believed Father was under the influence of methamphetamines. The police arrested Father for child endangerment (Pen. Code, § 273a, subd. (a)), vehicle theft (Veh. Code, § 10851), and burglary (Pen. Code, § 460, subd. (b)).

The Agency filed a dependency petition concerning Je.M., alleging pursuant to section 300, subdivision (b)(1) (section 300(b)(1)), that Je.M. suffered or was at substantial risk of suffering serious physical harm or illness because Father was unable to provide him regular care due to mental illness, developmental disability, or substance abuse. Among other things, the petition alleged that Father has a history of substance abuse and untreated mental health issues including " 'apocalyptic delusions,' " and that Father had been physical with Je.M. in the past. With regard to Mother, the petition alleged under section 300(b)(1), that she has a history of substance use and mental health issues. Pursuant to subdivision (g) of section 300, the Agency also alleged Mother's whereabouts and her ability and willingness to

care for Je.M. were unknown. The juvenile court detained Je.M. and placed him with his maternal grandparents. The court also issued a temporary restraining order, prohibiting Father from contacting Je.M.[2]

In February 2021, the Agency filed a first amended petition concerning Je.M. with an additional allegation under section 300(b)(1) that Mother failed to protect Je.M. by leaving him in Father's care despite knowing about Father's substance use and untreated mental health issues.

The Agency also filed a jurisdiction and disposition report in February 2021 in which it reported that Je.M.'s maternal aunt, Jamie C., stated that Father is mentally ill and previously resided in a sober living environment for people with a mental health diagnosis and substance abuse issues. Jamie C. reported that Father is delusional and believes the end of the world is coming, and his recent January 2021 arrest was his third attempt to get his children to live in a mineshaft. Jamie C. stated she feared for her nephews' safety and "if father gets one of these children in his care, this could result in the death of that child."

Similarly, Je.M. told the Agency that Father is " 'psychotic,' " believes Armageddon is coming, and appeared to be using drugs when picking Je.M. up around Thanksgiving time. Je.M. stated, during the January 2021 incident, that Father stole the truck to go to a mineshaft and had tubes for breathing because he thought stars and asteroids were going to hit Earth. Je.M. had observed Father having such delusions twice. During another incident in July 2020, Father picked him up from his aunt's home, without his aunt's permission, and made him climb over a 10-foot fence to go into an

---

[2] The juvenile court later issued a restraining order that was in effect at the time of the jurisdiction and disposition hearing and is set to expire in October 2022.

abandoned mineshaft where he said they should live because the world was going to end. Je.M. stated Father had physically shoved him recently, and he has seen Father " 'beat up' " Mother.

Father admitted past drug use but stated he had been sober for over two years. Father reported that he had been diagnosed with post-traumatic stress disorder ("PTSD") during a stay at a psychiatric facility in Napa about four years prior, but less than a year ago his doctor said he no longer needed to participate in therapy or take medications. He asserted that he graduated from a "dual diagnosis" facility less than one year ago, and that he had already gotten back on his past medications and agreed that further counseling would be beneficial.

The Agency reported that Mother and Ja.M.'s whereabouts were unknown, but that they might be staying in motels or in Mother's car. The report documented the maternal grandfather's statement that Mother had been living in their garage but left around Thanksgiving 2020. The maternal grandfather reported that Mother and Father both have mental health and substance abuse issues and that Father is a " 'tweaker.' "

A contested hearing in Je.M.'s case was set for April 29, 2021.

**B. The Detention of Ja.M.**

In the meantime, in early March 2021, the Agency filed a dependency petition concerning then 11-year-old Ja.M., who had been living in a car with Mother. The petition included similar allegations as in the petitions concerning Je.M.

The Agency's detention report documented Mother reporting that she lost her housing in 2019 and had been living with her parents. But her parents argued and hit her, so she went to live with Father who kicked her out two weeks prior. Mother claimed she could take care of Ja.M., though he

4

had not gone to school for two weeks and they brushed their teeth and used the bathroom in a Walmart. Mother indicated Father was abusive, they had not been together in 10 years, Father had not been in contact with the children until he went to "rehab" in 2020, and he "always had issues with meth." Mother denied using drugs and said she only occasionally drank alcohol. Ja.M. reported Father had behavioral and mental health issues, and might be a drug addict.

The juvenile court detained Ja.M.

### C. The Agency reports and amended petitions preceding the jurisdiction and disposition hearing

In a report filed in late March 2021 in Ja.M.'s case, the Agency reported that Ja.M. was placed with a foster family, but he really missed Mother. Ja.M. did not want contact with other family members, and the foster parents reported there had been an incident where he tried to scratch "No" into his skin with a stick.

In April 2021, the Agency filed a jurisdiction and disposition report in Ja.M.'s case recommending that Mother and Father receive reunification services. The report documented that Mother had completed drug and alcohol assessments and drug testing, and was waiting for information regarding a mental health assessment. Although she tested positive for amphetamines, Mother denied having a drug or alcohol problem and said she had a prescription for Adderall which can result in a positive amphetamine test. Father denied having a substance abuse problem and said he did not need services but would be willing to drug test though he is " 'not mobile' and 'he won't pay for it.' " Father also reported he had a warrant and admitted himself into " 'Stabler Lane behavioral hospital' " for around 10 days in February or March, and doctors put him back on medication he previously tapered himself off of. Father stated he now has a psychologist or

5

psychiatrist to monitor his medications. Father acknowledged that he was not ready to have custody of the children and agreed with receiving reunification services. Copies of the police reports from the January 2021 incident involving Je.M. were attached to the Agency's report.

On April 26, 2021, the Agency filed an addendum report in Je.M.'s case. This report documented Father's arrest on March 22, 2021, in connection with a warrant. And previously, on March 1, 2021, Father had been arrested for being under the influence of a " 'Central Nervous System Stimulant,' " after he locked himself in a neighbor's bathroom and stated aliens were after him, tried to break into a hotel, and then went to the post office where he told employees they were being " 'gassed.' " The police reports were attached to the Agency's report.

On April 28, 2021, the Agency filed a joint petition concerning both children which was labeled as the first amended petition for Ja.M. and a second amended petition for Je.M. The juvenile court denied a motion to bifurcate and scheduled joint contested hearing dates.

On June 22, 2021, the Agency filed a joint addendum report addressing both children's cases. Mother provided proof that she received a prior family law court order effective December 2017 to September 2020 that granted her sole legal and physical custody over both children and denied Father visitation sans proof of participation in a batterer's intervention program and negative drug tests. Mother also provided proof of a hair follicle test showing negative results for drugs dating back 90 days. Father agreed to participate in a substance use program and to attend outpatient treatment. The paternal grandparents—who do not see Father often—indicated they believed Father was not suitable to care for the children. The paternal grandparents reported that Father has a history of arrests and substance abuse. They also

6

asserted that Father hears voices and has delusions, and recalled an episode in winter 2020 when Father drove 14 hours into the Nevada desert at the behest of a voice, and he ended up rolling his car and breaking into a building.

On July 9, 2021, the Agency filed another joint addendum report that included the following information. Father had scheduled a drug and alcohol assessment with the Calaveras County Substance Abuse and Behavioral Health Program, but did not show up for it. Mother's lab results indicated she did not consume a measurable amount of alcohol in the previous 90 days. A substance abuse treatment counselor determined that Mother did not need drug or alcohol treatment, but continued to recommend that she seek mental health treatment and engage in parenting education.

On July 14, 2021, the Agency filed a joint third amended petition for Ja.M., and fourth amended petition for Je.M.[3] The Agency alleged pursuant to section 300(b)(1) that the children suffered, or there was a substantial risk they would suffer, serious physical harm or illness resulting from: the parents' failure or inability to supervise or protect them; the willful or negligent failure of the parents to supervise or protect the children adequately from the custodian with whom they were left; and the inability of the parents to provide regular care due to mental illness, developmental disability, or substance abuse.

In an allegation labeled "B-1," the Agency alleged that Father has a history of substance abuse and "unstable mental health needs" that put Ja.M.

_____

[3]     This was the operative petition at the jurisdiction and disposition hearing. The Agency filed this petition on the same day it filed a joint second amended petition for Ja.M. and third amended petition for Je.M. The later petition was filed in order to remove an allegation that Mother has an alcohol abuse issue, but otherwise the petitions were substantially identical.

7

and Je.M. at risk of severe neglect, serious physical harm or illness because: (a) Father has a history of engaging in criminal activity relating to methamphetamine use dating back to 2012; (b) he has apocalyptic delusions and in 2020 and 2021 told Je.M. he would take him to live inside a mineshaft where he would need to breathe through a tube; (c) Father was arrested in March 2021 for being under the influence of a controlled substance; and (d) Je.M. reported incidents of Father's shoving him and beating up Mother in front of him; Je.M. is afraid of Father and has observed Father appear "[t]weaky" like he was on some type of drug and has seen him walking in circles while talking excessively. In an allegation labeled "B-2," the Agency alleged Father has a criminal history that included Father taking Je.M. to steal a vehicle.

In allegations labeled "B-3," "B-4," and "B-5," the Agency alleged that: Mother has "unstable mental health issues" and exposed the children to a chaotic living environment; she failed to protect the children from Father's mental instability and allowed Father access to the children despite a family law court order prohibiting visitation; and her unstable mental health impacted her relationship with Ja.M. and caused him to exhibit "parentified behaviors."

The Agency also alleged pursuant to section 300, subdivision (c) that Je.M. has suffered, or is at substantial risk of suffering, serious emotional damage in Mother's care. Moreover, the Agency alleged pursuant to section 300, subdivision (j) that Ja.M is subject to the same parenting as his brother and is at substantial risk of abuse or neglect.

**D. The first day of the jurisdiction and disposition hearing**

On July 14, 2021, the court held a contested hearing. The court admitted the Agency's various detention, jurisdiction and disposition, and

8

addendum reports. Susan Snow, a dependency investigator for the Agency, testified briefly before the case was continued to future dates in September 2021.

In short, Snow testified that she had been assigned to the children's cases on March 29, 2021, and that she believed the primary concerns for the children were the parents' mental health issues and Father's substance abuse. So far, Father's mental health has been unstable, and he has paranoid and delusional thoughts that impact his parenting and pull his children into his delusions. For example, it was brought up repeatedly during her investigation that Father feels he needs to bring his children into a mineshaft to breathe through a pipe. Snow indicated there were three occasions when Father acted on this delusion and involved Je.M. Snow testified, based on her conversations with Father, that Father was aware he needed to address and take medication for his mental health issues. But Father admitted that during periods of stability he "will take himself off the medication or attempt to titrate himself off the medication because he is feeling better." Father did not acknowledge he was having mental health issues during the January 2021 incident involving Je.M., and instead blamed Je.M. for making allegations against him.

### E. The Agency addendum report preceding the continued jurisdiction and disposition hearing

In September 2021, the Agency filed an addendum report recommending family maintenance services for Mother as to Ja.M., family reunification services for Mother as to Je.M., and family reunification services for Father as to both children. The Agency reported Ja.M. had been released to Mother's care on September 24, 2021, and Mother had secured appropriate housing in El Dorado County, found Ja.M. medical providers, and verified the school he could attend if released to her. Further, Mother

9

had consistently attended therapy, participated in a parenting class and regular visitation, and Ja.M. wanted to be placed with Mother. Meanwhile, Je.M. and Mother were having less negative interactions and were communicating, but he wanted to remain with his maternal grandparents as he felt settled and wanted to participate in senior class activities. Je.M. said he had not heard of any information about Father, aside from seeing two pictures on Facebook.

The Agency reported Father had been arrested on September 17, 2021 for obstructing a police officer, though there had been no disposition for that arrest or his earlier January and March 2021 arrests. The Agency had submitted a referral for Father to Calaveras County Substance Abuse Behavioral Services in mid-June 2021, but the intake coordinator reported to the Agency's dependency investigator, Snow, that Father never showed up for services and that Father, in a phone call, "presented [as] unwilling to engage in their program."

### F. The continued jurisdiction and disposition hearing

On September 28, 2021, the court resumed the contested hearing. Mother did not contest the Agency's recommendations, but Father did. Father, however, did not personally attend the hearing.

Dependency investigator Snow continued her testimony. With regard to the allegations concerning Father's mental health instability, Snow testified she had no further communication with Father since the July 2021 hearing when she last testified, and to her knowledge he had not signed any releases so that she could speak to anyone at the Behavioral Health Center in Calaveras County. Snow testified that Father disclosed to her that he was diagnosed with PTSD and hospitalized in the past, including as recently as around March 2021, but she had no verification of a formal diagnosis. Snow

10

noted she had received accounts of Father's mental health instability from Je.M., the maternal grandfather, and the paternal grandparents.

Snow—who has decades of experience as a child welfare worker and dependency investigator—indicated that for the children to be placed with Father, she would need verification that Father's mental health and substance abuse issues are under control, which would entail her having contact with his therapeutic providers and obtaining drug test results. As of the hearing date, Father was not in a program and did not submit any substance abuse test results in response to Snow's requests, and Snow was unable to rule out that substance abuse was impacting Father's parenting. She expressed concern that Father's mental health instability manifests in delusions that lead to unsafe behavior that would impact his children, e.g., his desire to take Je.M. to live underground and breathe through pipes. She further noted that Father was arrested in September 2021 for obstruction of a police officer, which indicated to her that Father had not managed his mental health instability.

The juvenile court found Je.M. to be a child described by section 300(b)(1) and (c), and Ja.M. to be a child described by section 300(b) and (j), and declared them dependents of the court. The court granted the Agency custody of Je.M., Mother custody of Ja.M., and ordered the Agency provide Mother with family maintenance services as to Ja.M. and reunification services as to Je.M. The court ordered the Agency to provide Father with reunification services as to both Ja.M. and Je.M. The court also found clear and convincing evidence that Ja.M. must be removed from Father's physical custody, and that there were no reasonable alternative

11

means to protect him.  The court additionally granted the Agency's motion to transfer the case to El Dorado County.  Father filed a notice of appeal.[4]

## DISCUSSION

### A.  The Jurisdiction Order

Father challenges the juvenile court's jurisdiction findings as unsupported by substantial evidence.

#### 1.  *The Scope of Our Analysis*

Initially, we address Father's contention that his arguments concerning the jurisdiction findings under section 300(b)(1) and (j) must be separately addressed on the merits because adverse consequences will follow from the findings.  For its part, the Agency urges us to dismiss the appeal because Mother is not appealing the jurisdiction order and Father does not challenge jurisdiction based on Mother's conduct.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.)

"Under the doctrine of justiciability, courts generally do not act upon or decide moot questions or abstract propositions, nor do they issue advisory opinions.  [Citation.]  'An important requirement for justiciability is the availability of "effective" relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status.'  [Citation.]  'For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence' or is unchallenged."  (*In re L.O.* (2021) 67 Cal.App.5th 227, 237.)  As the Supreme Court has stated, " '[w]hen a dependency petition alleges multiple grounds for its

---

[4]     In October 2021, after the notice of appeal was filed, the Agency filed a joint fourth amended petition for Ja.M. and a fifth amended petition for Je.M., which only amended allegations regarding Mother's housing instability.

12

assertion that a minor comes within the dependency court's jurisdiction, *a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.* In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773, italics added.) That said, " '[w]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) "could have other consequences for [the appellant], beyond jurisdiction" [citation].' " (*In re L.O.*, at p. 237.)

Because Father challenges the juvenile court's disposition order, which was based on its jurisdiction findings, we will address Father's challenge to the jurisdiction order despite Mother's failure to appeal. That said, the section 300, subdivision (j) allegation in the petition is based on the section 300(b) allegation. Father fails to persuade that addressing both would have any practical impact on the family, now or in the future. (*In re I.A.*, *supra*, 201 Cal.App.4th at pp. 1490–1491.) Accordingly, we will limit our analysis to whether substantial evidence supports the juvenile court's finding that Ja.M. is a child described by section 300(b)(1).

Before doing so, we note that Father's 104-page opening brief challenges various specific factual allegations in the dependency petition, and argues we must separately consider all of his arguments as to each of them. We disagree. Father's position is unsupported by authority. Father cites to section 332, subdivision (f), which provides that a petition should contain a

13

concise statement of separately stated facts, but this statutory provision is aimed at ensuring sufficient notice to the parties so they can respond to the charges.[5] (*In re T.V.* (2013) 217 Cal.App.4th 126, 131 (*T.V.*); see, e.g., *In re Alysha S.* (1996) 51 Cal.App.4th 393, 396.) Nothing in section 332 requires that substantial evidence support each separately alleged supporting *fact* in a petition before a court may properly take jurisdiction over a child. (See § 356 ["After hearing the evidence, the court shall make a finding . . . whether or not the minor is a person described by Section 300 and the specific subdivisions of Section 300 under which the petition is sustained."].)

Father also cites *In re Alexander K.* (1993) 14 Cal.App.4th 549 and *In re Tamneisha S.* (1997) 58 Cal.App.4th 798, but those cases do not support his view of the scope of our analysis. While *Alexander K.* indicates that parents have a due process right to notice of their alleged offending conduct (*Alexander K.*, at p. 558), Father here is not complaining about defective notice due to insufficient allegations in the petition. Rather, he is challenging the sufficiency of the evidence produced at the contested hearing in support of the jurisdiction order.

We turn now to address the adequacy of the evidence to sustain jurisdiction under section 300(b)(1).

### 2. *Substantial Evidence Supports the Jurisdiction Order*

Dependency jurisdiction is warranted pursuant to section 300(b)(1), when a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability

---

[5] The sufficiency of a petition cannot be challenged for the first time on appeal. (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 82–83.) In any event, " '[i]f the jurisdictional findings are supported by substantial evidence, the adequacy of the petition is irrelevant.' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 166.)

of the child's parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." "Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' " (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

In reviewing the jurisdiction order, we apply the substantial evidence standard. "Evidence is ' "[s]ubstantial" ' if it is reasonable, credible and of solid value. [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

In this case, there was ample evidence that Father has mental health issues and a history of substance abuse that places Ja.M. at substantial risk of suffering serious physical harm or illness. Father himself acknowledged prior substance use, though he stated that he had been sober for over two years, and also that he graduated from a "dual diagnosis facility" less than a year ago. Father also admitted past and present mental health issues. For example, he reported he was diagnosed with "PTSD" during a stay in a

15

psychiatric facility in Napa about four years prior to 2021, recalling "there was 'an incident in which my PTSD consumed me and my thoughts to the point w[h]ere I didn't have a clear understanding of my thoughts." This incident occurred before he was "properly medicated" and he "didn't know what was happening. I was scared and I thought whatever was going to happen it was going to be really bad and my immediate response was to act on the safety of my family. Things that I did in regards to what mental state I was in, are unacceptable but I was more concerned with the safety of my kids . . . ."

Family members and Je.M. offered their own observations of Father's substance use and mental health issues. Maternal aunt Jamie C. reported that Father is delusional, believes "the end of the world is coming," and he intended to live in a mineshaft. She reported that Father suffers from psychosis, acts on his psychosis when using methamphetamines, and previously lived in a sober living environment for people suffering from both mental health issues and substance abuse. Similarly, Je.M. recounted that Father is " 'psychotic,' " and he thinks the end of the world is coming via "different scenarios that include the sun blowing up, certain numbers signifying imminent earthly destruction, a star exploding and other terrifying delusional thoughts." Je.M. reported that when he went to live with Father around Thanksgiving 2020, he could tell Father was " '[t]weaking,' " and Father kept walking in circles and talking excessively. Father's parents also reported that Father has a substance abuse history, and mental health issues including delusions, such as hearing voices and thinking that he is being called by God to save everyone.

There was also ample evidence that Father's mental health instability and substance use are ongoing issues that impact his behavior and parenting.

16

In January 2021, with Je.M. in his custody, Father stole a car and told Je.M.—then an unlicensed 16-year-old—to drive that car from California to Idaho so they could live in a mineshaft where they would have to breathe through tubes to survive. As a result of this incident, Father was arrested for burglary, vehicle theft, and child endangerment. The arresting police officer believed Father was under the influence of drugs or alcohol. Moreover, Je.M. reported that sometime in 2020, Father took him from his aunt's home, without his aunt's permission, to an abandoned mineshaft, which Father had Je.M. access by climbing a 10-foot fence. Father suggested the two live there because " 'the world was going to end.' " Afterward, he took Je.M. to a courthouse to see if he could get custody of Je.M.; eventually the police showed up and removed Je.M. from Father. Aunt Jamie C. reported that Father had tried three times to obtain his children to live in a mineshaft and breath through tubes.

Father's parents provided an account of another incident in the winter of 2020. Father had heard a voice telling him to " 'suit up,' " he then drove 14 hours to the Nevada desert, rolled his car, heard a voice telling him to follow " 'two points in the sky,' " and walked into the desert where he broke into a radio tower.

Although Father told the Agency that he admitted himself to a behavioral hospital in February or March 2021 for about 10 days and resumed taking medication while monitored by a psychiatrist or psychologist, the court was not required to take Father at his word. Additionally, the court properly considered Snow's testimony that Father admitted to taking himself off medication during periods of stability "because he is feeling better." Moreover, by the time the contested hearing resumed in September 2021, Father had declined to engage in mental health services that the Agency

17

referred him to and had not spoken with Snow since the July 2021 hearing. Father did not attend the continued contested hearing. Father had been arrested on September 17, 2021 for obstructing a police officer and had been previously arrested in early March 2021 for being under the influence of a "Central Nervous System Stimulant." The incident leading to the March arrest involved Father locking himself in another person's home "hallucinating aliens were after him," Father trying to break into another property, Father going into a post office telling the employees "they are getting gassed," and Father telling the arresting officer that his lunchbox was gassing him.

The evidence of Father's mental health and substance abuse issues *and* their impact on his behavior, which had already directly affected Je.M., amply supported the juvenile court's finding that Ja.M. was at significant risk of future harm due to Father's mental health instability and substance abuse issues. We disagree with Father's arguments to the contrary.

Father appears to suggest that statements made by family members, such as Je.M. and Jamie C., about Father's mental health or substance use that were documented in the Agency reports, are hearsay and cannot be credited pursuant to section 355, subdivision (c) (section 355(c)).

Under section 355, subdivision (b), "[a] social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)." Section 355(c) provides: "If a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, *the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding* or any ultimate fact upon which a

18

jurisdictional finding is based, unless the petitioner establishes one or more of the following exceptions[.]" (Italics added.) The four statutorily enumerated exceptions occur when: (A) the hearsay evidence would be admissible under case law or a statutory exception; (B) the declarant is under 12 years old and the subject of the jurisdiction hearing; (C) *the hearsay declarant is a specific person, such as a peace officer*; or (D) the hearsay declarant is available for cross-examination. (§ 355(c)(1)(A)–(D).)

Under section 355(c), *uncorroborated* hearsay statements do not constitute substantial evidence and cannot be used as the *exclusive* basis for finding jurisdiction under section 300. (*In re B.D.* (2007) 156 Cal.App.4th 975, 984.) "Corroborating evidence is '[e]vidence supplementary to that already given and tending to strengthen or confirm it. [It is] [a]dditional evidence of a different character to the same point.' [Citation.] In this context, corroborating evidence is that which supports a logical and reasonable inference that the act described in the hearsay statement occurred." (*Ibid.*) "[C]orroborative evidence, whether direct or circumstantial, (1) is sufficient if it tends to connect the allegedly offending parent with the alleged negligent act even though it is slight and ' "entitled, when standing by itself, to but little consideration [citations], nor does it need to establish the precise facts" ' in the hearsay statements; (2) is sufficient if it tends to connect the allegedly offending parent with the alleged negligent act and the parent's ' "own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient" ' to find jurisdiction; (3) need not ' "go so far as to establish by itself, and without the aid of the testimony of [the hearsay declarant], that the [allegedly offending parent] committed the [negligent act] charged" '; (4) may include the allegedly offending parent's ' "own testimony and inferences therefrom, as well as the

19

inferences from the circumstances surrounding the entire transaction" '; and (5) may consist of '[f]alse or misleading statements to authorities . . . or as part of circumstances supportive of corroboration.' " (*In re Christian P.* (2012) 208 Cal.App.4th 437, 448.)

Here, statements made by family members, such as Je.M. and Jamie C., about Father's mental health issues or substance use history were corroborated by other admissible evidence, such as Father's own statements (Evid. Code, § 1220) and statements made by the police officers (§ 355, subd. (c)(1)(C)).

Next, Father contends there was only speculation as to whether he had a mental health or substance abuse problem that impacted his behavior. In support, Father's points to statements made by the Agency and the juvenile court during the contested hearing concerning whether Father's behaviors were caused by his substance use or mental health instability or both. Father argues the statements demonstrate the Agency had no specific and current evidence about whether Father had a mental health or substance abuse problem, and no evidence of a nexus between those issues and a risk to the children. This is unpersuasive. As discussed, there was ample evidence that Father's mental health was unstable and he had a substance abuse problem, and that these ongoing issues affect his behavior, including his parenting. And notably, there was no reason to believe that Father had gained control over these issues by the time of the hearing in September 2021. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216 ["A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' "].)

We are also unpersuaded by Father's argument that the section 300(b)(1) allegation was unsupported because a mental illness

20

requires a diagnosis under the Diagnostic and Statistical Manual of Mental Disorders (DSM) and "no DSM standards were considered" by the juvenile court or the Agency. Father cites no authority indicating that a formal diagnosis under the DSM is necessary before a juvenile court can exercise jurisdiction due to mental health issues. Nor does the language of section 300(b) require such a diagnosis. Indeed, the purpose of the dependency statutes is to protect children who are being abused or neglected and to ensure the safety, protection, and well-being of children who are at risk of harm. (§ 300.2.) As is the case here, so long as a parent's mental health issues place the children at a substantial risk of harm, section 300(b) is satisfied and no formal diagnosis is required. (See *In re Khalid H.* (1992) 6 Cal.App.4th 733, 735–737.)

Father also contends that harm to the child cannot be presumed from the mere fact that a parent has a mental illness, and argues there must be substantial evidence of risk, not mere speculation. But the record shows the trial court did not presume harm to Ja.M. from Father's mental illness or engage in speculation about the risk of future harm. Again, there was evidence that Father's issues actually impacted his behavior and parenting, and already directly put Ja.M.'s older sibling in harm's way.

In sum, substantial evidence supports the jurisdiction order.

## B. The Disposition Order

Father next contends the juvenile court's order removing Ja.M. from his custody must be reversed "for lack of substantial evidence because the court . . . failed to comply with section 361, subdivision (e) which . . . required it to provide a statement of facts as to the factual basis for its findings under clear and convincing evidence. It must also be reversed . . . because the court . . . abused its discretion by failing to indicate an awareness of all the

material facts and evidence and an awareness of the legal principles involved which were essential to an informed, intelligent and just decision." We cannot agree.

The juvenile court found clear and convincing evidence that Ja.M. must be removed from Father's custody, as leaving Ja.M. with Father would cause a substantial danger to Ja.M.'s physical health, safety, protection, or physical or emotional well-being. The court also found there were no reasonable alternative means to protect Ja.M., and "[r]easonable efforts were made to prevent or eliminate the need for removal." Father did not object below to the absence of a fuller statement of reasons, and had he done so any perceived defect could easily have been cured. His argument on appeal is forfeited. (See *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.)

Even if not forfeited, the argument fails. Section 361, subdivision (e) provides: "The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) "[W]hen a juvenile court fails to make the factual findings required under section 361, subdivision (e), its removal order is subject to the constitutional mandate that no judgment shall be set aside 'unless, after an examination of the entire cause, including the evidence, the [appellate] court shall be of the opinion that . . . ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1068.)

Here, based on our review of the entire case, we conclude it is not reasonably probable that Father would have obtained a more favorable result absent the perceived error. The record contains substantial evidence from

22

which a reasonable fact finder could have found it highly probable that allowing Father to live with or exercise custody of Ja.M. would pose a substantial danger to Ja.M.'s physical health, safety, protection, or physical or emotional well-being, and no reasonable means aside from removal that could protect the child.  (§ 361, subd. (d); *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 ["When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."].)  Additionally, there was no basis to infer that Father—who had not participated in any services already offered to him—would have participated in any other services such that Ja.M. could have safely remained in Father's care.

In sum, we reject Father's contention that the removal order must be reversed.

## DISPOSITION

The orders of the juvenile court are affirmed.

_____

Fujisaki, J.


WE CONCUR:


_____

Tucher, P. J.


_____

Rodrìguez, J.


A163596

24